**THOMPSON DRILLING CO. v. NORTH-
ERN ORDNANCE, Inc.**
Civil Action No. 3488.

District Court, W. D. Oklahoma.
Sept. 15, 1947.

Looney, Watts, Fenton & Billups, of Oklahoma City, Okl., for plaintiff.

Martin, Logan, Fenney & Stantion, of Tulsa, Okl., for defendant.

VAUGHT, District Judge.

On October 23, 1946, the plaintiff filed its petition in the District Court of Oklahoma County, Oklahoma, in Cause Number 114138, seeking to recover $1,850 from the defendant under a contract entered into between the parties on May 5, 1944, which contract was set out as Exhibit A and attached to the petition. Plaintiff alleged that under the terms of the contract it made available to the defendant "equipment and personnel" for which the defendant became obligated to pay the plaintiff upon a monthly basis of $1,850 per month. That under the terms of the contract, paragraph XIV, the defendant was required to give the plaintiff thirty days' written notice of cancellation, which it failed to do, and by reason thereof it became indebted to the plaintiff in the sum of $1,850 for the period from October 10, 1944, to November 10, 1944. Service was duly obtained and the defendant filed an answer on November 21, 1946, and an amended answer on December 10, 1946,

Thereafter on January 28, 1947, the plaintiff filed an amendment to its petition in which it stated that the reasonable rental value of the equipment furnished was $1,850 per month; that because of the failure of the defendant to comply with the terms of the contract in properly notifying plaintiff of its intention to terminate the contract, its equipment was idle to November 10, 1944; that in an effort to reduce the damage caused, it proceeded to rebuild and recondition its equipment which required a period of thirty days, and later, drilled three water wells which occupied an additional thirty days; and that on account of the breach of the contract by the defendant, its equipment was forced to remain idle for two months and five days between November 10, 1944, and February 15, 1945, and by reason thereof it had suffered damages in the sum of $4,008, for which it prayed judgment.

By proper proceedings the cause was then removed to this court on March 6, 1947. On March 26, 1947, the defendant filed its answer to the petition and amendment to the petition of the plaintiff. It admitted that it entered into the contract with plaintiff. It denied the other allegations of the petition and each allegation of the amendment to the petition except paragraphs 3 and 5 thereof and stated it is without sufficient information to form a belief as to the truth of the statements contained in them. It alleged as a defense that notice of cancellation was given and received, and complied with the contract except that it was oral and not written; that both parties relied upon such notice and treated the contract as terminated; and that plaintiff waived its right to a written notice and is estopped to rely upon such right. The plaintiff filed a reply consisting of a general denial and a specific denial that notice of cancellation was given or received as alleged.

The facts are largely stipulated. A determination of the cause depends upon the interpretation of the contract and the action of the parties in their operation under its terms.

The contract was prepared by the plaintiff in February, 1944, and submitted to the defendant. It was not formally executed until May 5, 1944, but provided that it should begin as of February 15, 1944. Some minor changes were made in the contract as finally executed, but nothing that involves the questions before us.

The contract shows upon its face that it is an Oklahoma contract. Thus it is governed by the laws of Oklahoma. No principle of law is more thoroughly established in Oklahoma, both by statute and the decisions of the courts, than that ambiguity in a contract should be resolved against the party who drew it. Continental Oil Company et al. v. Fisher Oil Company, 10 Cir., 55 F.2d 14, 16, 17:

" * * * A capable lawyer for the company drew the contract. And even if we assume the instrument to be ambiguous in this respect, the rule applies that the doubt be resolved against the party who drew it. Section 5057, C.O.S.1921 [15 O.S.1941 § 170]; Sac City Canning Co. v. Griffin Gro. Co., 99 Okl. 99, 225 P. 702. This is also the general rule. (Citing authorities.)"

The pertinent paragraphs of the contract are as follows:

"I. It is agreed that such holes are to be drilled by Second Party at locations in the United States as may be designated by a representative of the First Party. First Party shall pay Second Party therefor at a monthly rate of One Thousand Eight Hundred Fifty ($1850.00) Dollars per month for each drilling unit employed by Second Party. Each drilling unit shall consist of a portable drilling rig mounted on a truck and a water truck for servicing the drilling rig, together with one driller and two helpers. The drilling unit shall work on a daily eight hour shift, on a six day week basis or the equivalent thereof.

"II. When any drilling unit is employed on a double shift of sixteen hours daily, Second Party shall be paid for the second shift at the rate of Seventy Five ($75.00) Dollars for each extra shift. In the event any unit works for less than an entire month, the amount paid Second Party shall be that proportion of the monthly rate that the days worked bears to the total working days of that month. In the event any overtime, either by the first or second shifts, is in-

volved, the payment therefore shall be at the rate for the second shift as stipulated above. When the word month is used in this contract, a calendar month is meant unless otherwise specified. In the case of a lost shift or eight hours, the Party of the Second Part is to be paid at the rate of Twenty Five ($25.00) Dollars per shift."

"XIII. Invoices covering the drilling of holes as above provided shall be rendered promptly at the close of each month, and First Party agrees to make payment within ten days from the date of receipt of invoices.

"XIV. The agreements as set forth above are to continue in force for a period of 30 days beginning Feb. 15, 1944 and thereafter until cancelled by either Party upon thirty (30) day's written notice to the other, but in any event shall terminate at the end of one (1) year from its date."

The parties started to operate under the contract in February, 1944. It is stipulated that invoices were rendered by the plaintiff regularly for the months of February, March, April, May, June, July, August, September and October in compliance with the contract and were paid as rendered. It is further stipulated that the last actual work under the contract was completed October 2, 1944, after which date no further work was given the plaintiff by the defendant. From an examination of these invoices it will be observed that in each, aside from February, the pay is based upon hours of service, which apparently is charged and paid for at the rates provided in paragraphs I and II. The March invoice is based upon 227 hours at $8.56 per hour; April, 223 hours at $9.25 per hour; May, 1 month or 216 hours, 5 hours overtime at $8.56 per hour and 3 days rained out at $25 per day; June, 213 hours at $8.82 per hour; July, 177 hours at $8.66 per hour and 1 day rained out at $25; August, 255½ hours at $8.19 per hour; September, 222 hours at $8.89 per hour; and October, 19 hours at $8.89 per hour and 4 days rained out at $25 per day. No other invoices were submitted until July 8, 1946, which was for core drilling from October 10, 1944, to November 10, 1944. It is admitted that no core drilling was done during the time covered by this invoice. From the manner in which the parties themselves interpreted the contract, the conviction is inescapable that its intent was to pay only for work done at the rates provided.

But the plaintiff contends that under the contract it was entitled to thirty days' notice in writing before the contract could be terminated. This would be true unless the written notice was waived by the plaintiff. The evidence discloses that in the last week in September, 1944, George A. Thompson, one of the plaintiffs, inquired of C. V. Sidwell, production superintendent of the defendant company, as to whether the defendant would have more work for the plaintiff in the future, and at that time, Sidwell told him that he had received no orders from the defendant and did not know what the future plans of the defendant would be. That when the last work was completed under the contract on October 2, 1944, said Thompson inquired of said Sidwell if there were further holes to be drilled under the contract and was informed by Sidwell that there were none, and that he still did not know the future plans of the defendant. Prior to this conversation Sidwell had received notice of his discharge effective November 1, 1944; Thompson, however, did not know this. The campaign conducted by the defendant in drilling "exploration wells" was ended on or about October 2, 1944, and wide publicity of the fact was given on the 2nd, 3rd and 4th of November, 1944, and the office of the defendant was completely reorganized. It is apparent that Thompson was cognizant of some change in the situation which prompted his inquiry of Sidwell and elicited the information that there were no further exploration wells to be drilled under the contract. Following that conversation, plaintiff rendered an invoice on October 25, 1944, for only $268.91 which was promptly paid. Plaintiff made no further claim under the contract until July 5, 1946, when it wrote a letter stating that in rechecking its contract it was discovered that it had neglected to render a statement for time from October 10, 1944, to November 10, 1944, and sent the defendant a claim for $1,850. The letter of July 5, 1946, stated: "About one week previous to the stoppage

4

of work due to lack of core drilling locations set ahead, I notified your Mr. Sidwell a verbal notification of the terms of this contract." This is irrefutable evidence that somewhere about September 25 or 26, 1944, the plaintiff was apprehensive that no more such wells were to be drilled under the contract and that paragraph XIV of the contract was definitely fixed in the mind of Thompson. Then being advised again on October 2, 1944, by Sidwell that no more wells were to be drilled under the contract would hardly place the plaintiff in a frame of mind to neglect an item of $1,850, to say nothing of an item of $4,008 the plaintiff now claims is due under the contract. Even men of large affairs do not ordinarily neglect such items. It is clear that when plaintiff rendered the statement for final work in the sum of $268.91 and accepted payment of the same, it deemed the contract to be cancelled and had no intention of asserting any further claim.

The provision under paragraph XIV of the contract which provided for a thirty-day notice in writing to terminate the contract was one that could be waived by plaintiff. The conduct of plaintiff shows that it was its intention to waive such provision.

In American Central Insurance Company of St. Louis, Mo. v. Sinclair, 61 Okl. 17, 160 P. 60, quoting from the syllabus, the court defined the term waiver as follows:

"A waiver is the voluntary or intentional relinquishment of a known right, or such conduct of a party, or his authorized agent, as warrants an inference of such intent. It is essentially a matter of intention and may arise out of the acts done by a party, or his authorized agent, who has full knowledge of all the material facts out of which the right springs.

" 'A waiver involves the notion of an intention, entertained by the holder of some right, to abandon or relinquish instead of insisting on the right.' It is a question of fact to be determined by the jury."

It is the opinion of the court that the plaintiff by its acts and conduct waived the provision in paragraph XIV of the contract of a thirty-day notice in writing to terminate it and that the cause of action must fail.

Form of judgment consistent with this opinion may be submitted within fifteen days of this date.