GOULD et al. *v.* TRANSAMERICAN ASSOCIATES

[No. 114, September Term, 1960.]

286

*Decided February 13, 1961.*

The cause was argued before Brune, C. J., and Henderson, Hammond, Prescott and Horney, JJ.

*George W. Constable,* with whom was *Hugh J. Monaghan, II,* on the brief, for the appellants.

*Donald N. Rothman,* with whom were *Lewis A. Kann* and *Gordon, Feinblatt & Rothman* on the brief, for the appellee.

Prescott, J., delivered the opinion of the Court.

The Circuit Court of Baltimore City permanently enjoined the appellants from foreclosing a second mortgage in a suit, which was instituted on account of alleged defaults with respect to the payment of state and city taxes for the year 1959, and the appellants appealed.

The appellants are mortgagees under a purchase-money second mortgage, dated January 18, 1958, as modified by a "Mortgage Modification," dated April 27, 1959, securing the principal amount of $945,000 (the principal amount of the first mortgage was, as of December, 1958, approximately $434,000), on the property described as 200-208 W. Baltimore Street and 2-6 N. Liberty Street, Baltimore City, and generally known as the Butler Building.

The appellee is a New York limited partnership and is the mortgagor under the said second mortgage. One Marvin Kratter is its leading general partner.

On September 6, 1957, the appellants agreed to sell the said property to Kratter. The contract provided, *inter alia,* that the purchase-money second mortgage involved herein was to call for no interest and no amortization for a period of ten years, and thereafter interest was to be paid, together with amortization payments over some 28 years; that the mortgagor was to have no personal liability under the mortgage; that the forms of the notes and the mortgage were to be the same as those used in connection with the first mortgage then upon the premises; that the first mortgage contained covenants whereby the mortgagors agreed to pay taxes "when due" and "to remove liens within ten days," with acceleration rights in the mortgagee in the event of defaults; and that the sellers had "complied with all of the obligations of the mortgagor under said [first] mortgage and that said mortgage is now, and will at the time of closing, be in full force and effect *without any defaults thereunder.*" (Emphasis supplied.)

Prior to the settlement on January 18, 1958, Kratter assigned the contract to the appellee, and, at the settlement, certain differences arose between the parties with reference to whether or not the terms of the notes conformed to the provisions of the contract. The appellants also claim (and the

appellee denies) that the same differences arose with reference to the provisions of the mortgage. However, the deed and the mortgage were executed and recorded. The notes were executed and placed in escrow with the understanding that they would be revised to conform with the second mortgage "as finally executed," and they were thereafter so corrected.

At the time of settlement, taxes for the year 1958 were open and unpaid. Apparently this fact was known to the appellee as well as to the appellants; since an apportionment of the taxes was made on the settlement sheet, whereby the sellers were charged with taxes for seventeen days. No discussion by the parties was had at that time as to whether the sellers' failure to pay the taxes by January 18th constituted a default under the first mortgage, but, at the time of trial, Kingdon Gould, Jr., one of the appellants and the chief spokesman and negotiator for the sellers, testified that he had obtained permission from the holder of the first mortgage to pay the taxes for 1957 and 1958 at any time during the period "when taxes are flat," which he understood meant at any time before a penalty was incurred (which we will later see to be July 31st insofar as city taxes are concerned). Gould did not inform the appellees that he had requested, nor that he had received, such permission.

We have noted that the settlement took place on January 18, 1958. Gould claims that shortly thereafter he discovered that the second mortgage failed to conform with the provisions of the first mortgage in certain particulars, and he demanded that it be corrected. After failing to obtain what they desired by direct request, the appellants filed suit, on January 20, 1959, in the United States District Court for the purpose of obtaining certain changes in the terms of the second mortgage. There was no contention in this suit that the appellee was in default under the mortgage, either for the nonpayment of taxes or otherwise.

Following the suit, extensive negotiations between the parties took place, and modifications of the provisions of the second mortgage were finally agreed upon and incorporated in an instrument, which was dated April 27, 1959, termed "Mortgage Modification."

In this modification agreement, quite a few changes were made in the second mortgage; it will only be necessary to mention several. Although appellants contended that the original contract between the parties called for the second mortgage to have the same covenants and provisions (except as to the sum secured and repayment, etc.) as the first mortgage, the modification agreement failed, in several important aspects, to conform with the provisions of the first mortgage. The second mortgage originally had provided for a general grace period of 20 days for defaults and a 20-day period to "remove liens"; whereas the first mortgage provided for no general grace period, and allowed only 10 days to remove liens. The second mortgage was modified so as to eliminate the 20-day general grace period, except as to the covenant to maintain the property in good repair; the 20-day period for removing liens was reduced to 10 days; the option of the mortgagees to accelerate and foreclose was made exercisable "without declaration of said option and without notice," a provision that was contained in the first mortgage; and the attorney's fee in the event of foreclosure, which in the original second mortgage was 5% and in the first mortgage $500, was fixed at 2%.

In preparation for the settlement and execution of the Mortgage Modification, the appellee's attorney, Norman Howard, Esquire, had written Gould stating that the appellee would expect the appellants to withdraw the pending suit in connection with the mortgage and to furnish the appellee with a certification that the second mortgage was in full force and effect, without any defaults thereunder on the part of the mortgagor. Gould replied on April 21, 1959, saying, among other things, that the mortgagees would be willing to state that the mortgage was in full force and effect, and that no defaults had been declared thereunder by the mortgagors.

At the settlement, however, Gould, at first, refused to give a certificate about defaults, but yielded and did so when Howard pointed out what Gould had said in his letter, and insisted upon receiving such a certificate. The certificate stated that "said mortgage, as amended, is in full force and that no defaults have been declared thereunder by us [the mortgagees]."

The appellee's attorney testified that before he accepted the certification in this form he was careful to ask Gould whether there were, in fact, any defaults under the mortgage, and after Gould "hemmed and hawed," he finally said "No." Whereupon, appellee's attorney said: "All right, on the basis of that representation, I will accept this letter, this certification." The chancellor found that, "Gould assured or gave Howard the understanding that there were no defaults under the mortgage which the defendant [the appellee] accepted and relied on as it had a right to do." Insofar as the above is a finding of facts, we cannot say the chancellor was clearly erroneous. Maryland Rule 886 (a).

After the signing of the Mortgage Modification on April 27, 1959, and the withdrawal of the mortgagees' suit in the District Court, the appellee apparently felt that the differences between the parties, at least up to the above date, had been finally settled and disposed of, but the appellee was soon to learn that such was not the case. On May 12, 1959 (as noted by the chancellor, "Hardly had the ink dried upon the executed papers"), Gould wrote the appellee, stating that considerable repair work was necessary on the building, and that a list would be sent of matters requiring attention. This list was never furnished, but on May 28th, following, the appellants wrote the appellee, purporting to exercise their option so as to cause the whole principal sum secured by the second mortgage to become due and payable at once, giving as their reason therefor the alleged failure of the appellee to comply "with certain provisions of paragraphs three [wherein the appellees agreed to pay taxes, etc., when due] and six [wherein the appellee agreed that no prior lien to the second mortgage, except the first mortgage, would be allowed to remain on the property for ten days] of said mortgage as modified."

On May 29, 1959, the appellee's attorney answered Gould's letter of May 28th, denying knowledge of any default, stating that the appellee was prepared to cure any that existed, and requesting an enumeration of the alleged defaults. Gould replied on June 2, 1959, stating that state and city taxes for 1959 were open and unpaid, as well as metered water rent charges, sewerage taxes and a fire-line charge. Upon in-

vestigation, it was discovered that all of these bills (except the taxes) had been paid, with the exception of some $14.00 on a water cut-off charge, which was paid forthwith by the appellee. On June 16, 1959, Howard again wrote to Gould stating that there were no delinquent tax, water, sewer or other items against the property, and when the mortgage modification was closed: "* * * I thought that would be the end of all problems with respect to this mortgage, and not the beginning. I thought you were tired of the constant fighting and would be happy once you got what you wanted." Gould's reply to this was to file the suit to foreclose on June 26, 1959.

The appellee paid the state and city taxes on July 7, 1959.

In the posture that the case reaches us, it will only be necessary to state, in pertinent part, the substance of paragraphs three and six of the second mortgage. In paragraph three, the mortgagor agrees to pay all taxes "when due," and paragraph six provides that if any mechanics' or other liens that may be prior to the second mortgage, except the existing first mortgage, be created or rest upon any part of the premises for ten days without being released or discharged, or upon default in the performance of any condition or covenant of the mortgage, the mortgagees shall have the right, at their option, to accelerate the due date of the principal sum due under the mortgage, without declaration of said option and without notice.

It is conceded that state and city taxes for the year 1959 were not paid until July 7, 1959. The appellants, obviously feeling that their case was much stronger as it related to city taxes rather than to state taxes, confined their argument in their brief, in practical effect, to the question of city taxes, and we shall do likewise.

The appellants point out that by the Charter and P. L. L. of Baltimore City (1949), Section 34, the taxes, "shall be due and may be paid * * * on or after the first day of January next ensuing," and by the Code (1957), Article 81, Section 206, any tax may be collected by an action of assumpsit instituted at any time after the tax shall become due and payable, and insist that it is clear, when these sections are considered, that the taxes for 1959, paid on July 7th, were not paid "when due"

under the provisions of the mortgage (paragraph three), which resulted in a default that authorized their exercise of the option to accelerate the due date of the principal sum due under the mortgage and their right to foreclose. The appellee answers by saying that the Court must arrive at the intention of the parties to the mortgage, when they provided that a default would occur thereunder for failure to pay taxes "when due"; that the meaning of the word "due" in the tax statutes is not determinative of its meaning in the mortgage; that by all of the canons and standards of construction of contracts, the words "when due," as used in the mortgage, were intended to mean "before taxes are in arrears"; and as the suit was instituted on June 26th, and the taxes would not be in arrears, at the earliest, until July 1st, the foreclosure was premature and invalid.

The appellants also contend that appellee's failure to pay the 1959 taxes until July 7, 1959, constituted a default under paragraph six of the mortgage. They claim it is elementary that taxes are liens from January 1 of the year for which they are levied (citing Code [1957], Article 81, Section 70, and Charter and P. L. L. of Baltimore City [1949], Sections 34 and 52), and that taxes are prior to the lien of any mortgage. Consequently, when the appellee failed to pay the taxes until July 7th, it permitted a lien, prior to the second mortgage, to remain unpaid for a period of more than ten days, constituting a default under paragraph six. The appellee gives several answers to this contention. One of them is that it was clearly not the intention of the parties that the mechanics lien clause (paragraph six) should include the obligation to pay taxes, which appeared in another and separate covenant in the mortgage (paragraph three). The appellee points out that the appellants maintain that taxes are "due" on January 1st (and, therefore, must be paid immediately under paragraph three), and are liens from that date forward (and, therefore, need only be discharged before ten days under paragraph six to avoid a default), which would result in an inconsistency as to the time when the mortgagor would be required to perform a single obligation, the payment of taxes, and argues that when this occurs, the more particular and specific clause must govern.

We do not deem it necessary to answer these and the other claims and counter-contentions of the respective parties, with the exception of the question of waiver and estoppel, for we think, as did the chancellor, that Gould, by his actions, words, and conduct, waived the failure to pay the 1959 taxes until July 7, 1959, (even if we assume such failure constituted a default), and estopped the appellants from claiming such failure to be a default under the terms of the mortgage. We shall, therefore, assume, without deciding, that the appellee's failure to pay the taxes for 1959 until July 7th constituted a default under both paragraphs three and six of the mortgage.

There are a number of decisions and numerous text-writings upon the doctrines of waiver and estoppel. In them, the definitions of "waiver" are many and varied. The one that has most frequently been named is that waiver is "an intentional relinquishment of a known right." This definition is criticized by Professor Williston,[1] and he clearly points out that it is not comprehensive. Many courts now state that waiver includes the intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right,[2] and may result from an express agreement or be inferred from circumstances.

---

1. 3 Williston, Contracts (Rev. Ed.), p. 1961. See also 92 C.J.S., Waiver.

2. Zoeller v. Schneider, 297 P. 2d 40 (Cal. App.); Meyers v. Hoops, 140 N. E. 2d 65, 68 (Oh.); Lyon v. Aetna Life Ins. Co., 44 N. E. 2d 186 (Ind.); Thompson Drilling Co. v. Northern Ordnance, 73 F. Supp. 1, 4 (Dist. Ct., (W. Dist. of Oklahoma, 1947)); State v. Thompson, 206 P. 2d 1037, 1041 (Supreme Court of Arizona, 1949); City of Tucson v. Koerber, 313 P. 2d 411, 418 (Supreme Court of Arizona, 1957); Franck v. J. J. Sugarman-Rudolph Co., 241 P. 2d 1045, 1049 (District Court of Appeal, Second District, Division 3, California, 1952); Hanson v. Fidelity Mut. Ben. Corp., 13 A. 2d 456, 459 (Superior Court of Delaware, 1940); A-1 Cleaners & Dyers v. American Mut. L. Ins. Co., 30 N. E. 2d 87, 88 (Appellate Court of Illinois. First District. Third Division. 1940); Smith v. Coutant, 6 N. W. 2d 421, 425 (Supreme Court of Iowa, 1942); Prudential Fire Ins. Co. v. Trave-Taylor Co., 152 P. 2d 273, 275 (Supreme Court of Oklahoma, 1944); Rolison v. Puckett, 198 S. W. 2d 74, 78 (Supreme Court of Texas, 1946); Bowman v. Webster, 269 P. 2d 960, 961 (Supreme Court of Washington, 1954); 92 C.J.S. Waiver, p. 1043; Cf. 3 Williston, Contracts, § 679, p. 1961.

Waiver is closely inter-related and intertwined with estoppel. The distinction between them most frequently adverted to is that waiver rests upon the intention of the party, while estoppel rests upon a detrimental change of position induced by the acts or conduct of the party estopped. However, when an implied waiver is involved, the distinction is close, and sometimes the doctrines merge into each other with almost imperceptible gradations, so that it is difficult to determine the exact point where one doctrine ends and the other begins. 31 C.J.S., *Estoppel,* ¶ 61 (b). Many decisions (although perhaps loosely) use the terms as interchangeable, or convertible. It has been held that the same conduct may constitute both an implied waiver and an estoppel, *Sentinel Fire Ins. v. McRoberts,* 179 S. E. 256 (Ga.); that a waiver may be based on, or arise from, an estoppel, *Motz v. Root,* 4 N. E. 2d 990 (Oh.), *Kaller v. Spady,* 24 P. 2d 351 (Or.); and that a waiver, when established may amount to, or operate as, an estoppel, or, stated just a little differently, there may be an estoppel by waiver. *Lord Const. Co. v. Edison Portland Cement Co.,* 138 N. E. 39 (N. Y.), *August v. Collins,* 214 N. W. 951 (Mich.).

What we have said above is in accord with the Maryland decisions upon the subject. In *Benson v. Borden,* 174 Md. 202, 198 A. 419, a leading case upon the doctrines of waiver and estoppel, an officer of a corporation, then in receivership, had filed certain claims against the corporation for his unpaid, past due salary and royalties from a coal mine that he alleged were due him. As such officer, he had prepared income tax returns and financial statements of the corporation (the latter of which had been widely circulated), none of which disclosed his claims for the salary or the royalties. No additional credit was obtained by the corporation as a result of the tax returns or the financial statements, but the Court found that they did obtain for the corporation an indulgence from the creditors in not invoking the receivership sooner, during which period of indulgence the officer reaped certain benefits from the corporation.

The Court disallowed the claims, holding that the doctrine of equitable estoppel was applicable, and then went on

to say that this "conclusion is fortified by an inquiry as to whether the applicant is not precluded from asserting [his] claims upon the principle of waiver." The decision then cited 40 *Cyc.* 255, to point out the general distinctions between "waiver" and "estoppel," and stated further:

> "In the case before us, if the situation, condition, and conduct of the parties were not sufficient to bar the allowance of the alleged claims upon the ground that the appellant was estopped to assert the same, it is our further conclusion that by his acts and conduct, which formed part of the basis for declaring the existence of estoppel, he had taken such a position as, without regard to any influence upon or change of position on the part of others, would have justified the chancellor in decreeing that the [officer] had voluntarily waived the right to collect the coal and salary claims; such waiver having, in effect, modified to that extent any contract he may previously have had with the [corporation] with reference to the subjects of either of the claims. The conclusion that the appellant cannot sustain the claims by reason of his waiver thereof is an illustration of the close inter-relation of waiver and estoppel; for, in substance, it is a finding that he is estopped to assert such claims because of having waived them; in which connection the language of *Crosswell v. Connecticut Indemnities Assn.,* 51 S. C. 469, 478, 29 S. E. 236, 239, may be appropriately quoted as follows: '[Waiver is] the relinquishing, giving up, or surrendering some known legal right, [and] may be found to exist if one "acts in such a way * * * that his conduct implies that he has waived his right," and * * * "amount[s] to a bar or obstruction when once established," and * * * "might be said to be an estoppel." ' "

The later case of *Wright v. Wagner,* 182 Md. 483, 34 A. 2d 441, was, likewise, decided on the doctrines of equitable estoppel and implied waiver. The decision repeated much that

had been said in the *Benson* case, pointed out that whether or not the doctrine of equitable estoppel applies depends upon the facts of each particular case, stated the doctrine operates to prevent a party from asserting his rights under a general technical rule of law, when he has so conducted himself that it would be contrary to equity and good conscience for him to do so, and further stated that it is well settled that the same conduct may constitute both an implied waiver and an estoppel, and there may be an estoppel by waiver.[3]

We turn now to an application of the above principles of law to the facts in the case at bar. Gould has insisted throughout these proceedings that the taxes were "due under the provisions of the mortgage as of January 1st, of each year." At the time of the first settlement on January 18, 1958, he knew that the current taxes had not been paid, and, although he had agreed to deliver title to the appellee without any default under the first mortgage (which contained the same covenant in regard to the payment of taxes as the second mortgage), he made no mention of the taxes not having been paid, nor did he insist, nor even suggest, that they be paid by the appellee, which was financially able to pay them at any time. He claimed that he had obtained permission from the first mortgagee to delay their payment, but, on this subject, he also was silent at the settlement. The position he maintains now seems to be that immediately after the settlement of this important transaction, the appellee was in default, and (although they made no effort to do so at the time) the appellants had the right to accelerate the large principal sum due, so as to make it payable immediately, though the mortgage called for no interest for some ten years. If this were his position at the time of the first settlement, fair play and honest dealing called for him to make it known.

Under paragraph three of the mortgage, the appellee was

---

3. See also Crane Co. v. Onley, 194 Md. 43, 69 A. 2d 903, Triton Realty Co. v. Frieman, 210 Md. 252, 123 A. 2d 290, and Mohr v. Universal C.I.T. Credit Corp., 216 Md. 197, 140 A. 2d 49, as several of the many Maryland cases dealing with equitable estoppel and/or waiver. Cf. Eastover Stores, Inc. v. Minnix, 219 Md. 658, 150 A. 2d 884; Pollin v. Perkins, 223 Md. 532, 165 A. 2d 908.

obligated to furnish the appellants with receipts showing the payment of all taxes, yet Gould, even though he knew the 1958 taxes had not been paid at the time of settlement and he filed the District Court suit on January 20, 1959, made no request for receipts showing the payment of either the 1958 or 1959 taxes.

This brings us to the crucial "Mortgage Modification" settlement on April 27, 1959, at which time, as we have pointed out above, Gould assured Howard that there were no defaults under the mortgage, and, relying upon such assurance, the appellee altered its position, and made certain important concessions in the modification agreement, not the least of which were the removal of the ten-day grace period for curing the non-payment of "interest and/or amortization or for any other monies required to be paid by the Mortgagors * * *," and the addition of a provision making the option of the mortgagees to accelerate and foreclose exercisable "without declaration of said option and without notice."

After obtaining these valuable and important concessions and others under the modification, Gould, very shortly thereafter, made a claim of defaults concerning repairs that he did not, and apparently could not, support. Then followed the correspondence between Howard and Gould, already mentioned, and the institution of suit to foreclose. Gould's actions and conduct seem clearly to indicate that he was not vitally interested in the payment of the comparatively small sum due for taxes, but that he was particularly interested in accelerating the payment of the large principal sum secured by the mortgage, which would, otherwise, not begin to bear interest for some years. As was stated in *Phillips Roofing Co. v. Md. Broadcasting Co.*, 184 Md. 187, 197, 40 A. 2d 298, his "conduct does not commend itself to a court of equity."

We think that under the circumstances, as they have been enumerated above, the words, actions, and conduct of Gould amply justified and warranted an inference by the appellee that the appellants had relinquished their right (still assuming, without deciding, the failure to pay the taxes by June 26, 1959, the date the suit was filed, was a default) to exercise their option to accelerate the principal sum due under the

mortgage, or to foreclose, for the non-payment of the 1959 taxes at any time before they would start to draw interest, which, as far as city taxes were concerned, was at any time before August 1, 1959. This, of course, means that his words, actions and conduct constituted an implied waiver.

We think that in the light of the testimony with regard to the custom prevailing in Baltimore as to the time when taxes are deemed to be in default, there is no reason for construing the appellants' waiver as applying to any period short of July 31, 1959, the last day on which city taxes could be paid without interest or penalty, there being no actual change in the situation affecting the parties between the date of the settlement of the District Court suit (April 21), the date of the appellants' demand of May 28th, the date of institution of foreclosure proceedings (June 26th), or even the date of actual payment of the taxes (July 7th).

And we further think these same words, actions and conduct of Gould operated as an estoppel, especially in view of the detrimental change of position taken by the appellee in its concessions in the modification agreements; and, in view of his said words, actions and conduct, that it "would be contrary to equity and good conscience," [4] for him to be allowed to exercise his option to accelerate, or to foreclose, for the failure to pay the 1959 taxes until July 7, 1959.

Gould contends he did not know of the non-payment of the 1959 taxes until May 18, 1959, and that he could not waive, nor could he be estopped from asserting, a right of which he had no knowledge. We have noted above that paragraph three provided that he was to be furnished proper receipts showing the payment of taxes. When he failed to receive the receipts for 1959, and he did not demand, nor request, them, he was put on notice that the taxes had not been paid up to the time of the modification agreement, and the knowledge of that fact was imputable to him. In the case of *Monahan v. Mutual Ins. Co.,* 103 Md. 145, 159, 63 A. 211, (a case dealing with both waiver and estoppel), the Court, speaking through Chief Judge McSherry, quoted from

---

4. Wright v. Wagner, supra.

a Supreme Court case as follows: "Granting that the continued receipt of premiums or assessments after a forfeiture has occurred will only be construed as a waiver when the facts constituting a forfeiture are known to the company [citations], this is true only of such facts as are peculiarly within the knowledge of the assured. If the company ought to have known the facts, or with proper attention to its own business, would have been apprised of them, it has no right to set up its ignorance as an excuse." And this statement seems to be in accord with the weight of authority elsewhere. 31 C.J.S., *Estoppel,* Section 70 (a), states: "It is sometimes said that actual knowledge of the facts is necessary; but generally it is not considered indispensable that the knowledge should be actual if the circumstances are such that a knowledge of the truth is necessarily imputed to the party sought to be estopped * * *." And practically the same thing is said of waiver under said Section 70, under subsection (b).[5]

*Decree affirmed, with costs.*

---

5. Note 66 of this subsection carries a list of the decisions in accord. See also 19 Am. Jur., Estoppel, ¶ 49, in accord, but only relating to estoppel. Such cases as Seymour v. Finance & Guaranty Co., 155 Md. 514, 537, 142 A. 710, are easily distinguished from the case at bar.