758 A.2d 75

Stephen MARKOV

v.

Robin MARKOV.

No. 58, Sept. Term, 1999.

Court of Appeals of Maryland.

Aug. 23, 2000.

Michael J. Lay (Motsay and Lay, on brief), Baltimore, for Appellant.

John J. Ryan (Ryan & Drewniak, P.A., on brief), Annapolis, for Appellee.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

RAKER, Judge.

The parties in this appeal, Stephen Markov, Appellant, and Robin Markov, Appellee, were granted an absolute divorce by the Circuit Court for Anne Arundel County, as sought by Appellee, on December 28, 1998, just three days after the twelfth birthday of twin girls who were born during the first year of the couple's marriage. Presented for our review is the propriety of the Circuit Court's finding that Appellant is equitably estopped from denying paternity of the two girls and its concomitant decision awarding Appellee child support as part of the relief that she requested in her divorce action. In addition to concluding that the Circuit Court incorrectly formulated its estoppel of Appellant on the issue of paternity and improperly issued a ruling as to Appellant's *non*-paternity of the children, we shall hold that Appellant may not be estopped from denying a duty to pay child support until Appellee establishes financial detriment.

### *Factual Background*

Appellant and Appellee were married in Baltimore County on Valentine's Day in 1986. A little over ten months later, on Christmas Day of that same year, Appellee gave birth to twin girls, Amanda and Kelly. Despite these seemingly blessed beginnings, the parties' relationship unfortunately did not prove to be everlastingly blissful. In the summer of 1992, Appellee confessed to having had a short-lived, extramarital liaison with a college student some two weeks after her wedding day.[1] This revelation significantly underscored Ap-

---

1. There exists some confusion within the record and the parties' briefs as to when Appellee informed Appellant of her adultery and the associated doubt as to, if not negation of, Appellant's paternity of the twin girls. Most of the testimony and excerpts from the briefs indicate or refer to the summer of 1992 as the time of disclosure, yet, in other parts, the year is professed to be 1991.

pellant's earlier uncertainty about his paternity of the two girls, arising from the fact that he had undergone a vasectomy sometime prior to the wedding.

Over the next few years, the couple endured periodic episodes of separation, of varying but always short duration, until March of 1997, when the parties separated permanently. Although Appellant and Appellee remained apart since that time, Appellant voluntarily made support payments to Appellee until October of 1997[2] and continued a paternal relationship with the twin girls, either through actual visitation or telephone calls, until May of 1998, when he stopped all contact with them. Insofar as the parties' pleadings and testimony on various factual occurrences and conversations conflict, and given that the Circuit Court did not issue specific findings of fact, it is unclear whether either person, for a significant part of their early marriage, was completely sure as to the veracity *vel non* of Appellant's status and representation as the twin girls' father. In any event, with respect to the later years of their marriage, both parties have believed for a long time, at least since 1992, that Appellant is not the children's biological father. The parties steadfastly abide by this position even though, according to the record, no scientific evidence confirming (or refuting) such has ever been produced or even procured.

### Procedural Background

In initiating the divorce action, Appellee alleged in her "Complaint for Limited Divorce and Other Relief" that the twin girls "were born to the parties as a result of their marriage." As part of her demand for relief, Appellee requested that "she be awarded child support pursuant to the Maryland Child Support Guidelines." In timely fashion, Appellant filed a written answer generally denying a great

---

2. The parties differ on the purpose of these payments. Appellant maintains that he sent money simply to help "pay the bills;" Appellee contends that the contributions were directed expressly to the support of the two girls.

majority of Appellee's allegations. At the same time, Appellant filed a motion pursuant to Maryland Rule 2–423 asking the Circuit Court to issue an order requiring that the parties "and the alleged children of the marriage submit to a blood test for purposes of determining paternity."

Appellee submitted a written answer to Appellant's motion stating that "a blood test for paternity is entirely unnecessary ... as paternity is not an issue in this case and it is admitted and established that [Appellant] is not the biological father of the two (2) minor children."[3] In addition, Appellee asserted that Appellant "should be estopped from denying that he has held himself out as the father of the two (2) minor children and that he is the only father that the children have known."[4]

On February 2, 1998, the Circuit Court directed as follows:

As [Appellant] requested a hearing, and given that the blood tests could in fact be/or lead to, a final disposition of the claim, or defense to a part of the claims, the matter needs a hearing.

Schedule the Motion for Blood Test before any judge.

Nevertheless, it appears that a hearing on the motion for blood tests was never conducted. By way of a letter to the Circuit Court dated January 30, 1998, Appellant, the party who had requested the hearing, seemingly waived the hearing as unnecessary in stating, "In as much as [Appellee] confirmed that [Appellant] is not the father of her children, there now

---

**3.** At the end of her "Answer to Motion for Order for Blood Test," Appellee attached a proposed order for the Circuit Court's consideration, to the effect "that [Appellant]'s Motion For Order For Blood Test be denied as [Appellant] is not the biological father of the two (2) minor children born during the parties' marriage and paternity is not at issue in this case."

**4.** Despite the more limited, and perhaps ineffectual, estoppel arguably sought by Appellee's pleading in her answer to Appellant's motion for the blood test, it is clear that the Circuit Court interpreted her pleading as a request that Appellant be equitably estopped from denying paternity of the twin girls altogether and absolutely. Indeed, in her later filings to the Circuit Court, Appellee requested "[t]hat the court find that [Appellant] by virtue of his actions is estopped from denying that he is the 'father' of the two minor children."

appears to be no issue as to [Appellant]'s lack of biological parentage in this case; and [Appellant] would appreciate the Judge signing the proposed Order, accordingly." [5]

The Circuit Court subsequently denied Appellant's motion for the blood test, issuing an order dated March 9, 1998 that stated in part:

1. That [Appellee, Appellant] and the previously alleged children of the parties are **not** required to submit to a blood test for purposes of determining paternity in light of Plaintiff's Answer admitting and confirming that the Defendant is in fact **not** the biological father of the two (2) children, namely: Amanda Markov and Kelly Markov;

2. That [Appellant] be and is hereby determined and ruled **not** to be the biological father of the said two (2) children, namely: Amanda Markov and Kelly Markov.

By this order, Appellant's non-paternity was thus established for purposes of the case to the satisfaction of the Circuit Court as well as, apparently, to the satisfaction of Appellee, but not to that of Appellant. Despite the Circuit Court's declaration that he was not the biological father of the two girls, Appellant renewed his request "[t]hat the Court pass an Order requiring the parties and the alleged children of the marriage to submit to a blood test to determine paternity of the said children." The litigation then continued as to whether Appellant should be ordered by the court to continue to pay child support.[6]

---

**5.** Although the letter indicates that Appellant's "proposed Order" was "[e]nclosed herewith," the record furnished to this Court does not include such an order proposed by Appellant. Consequently, we can only speculate as to what Appellant had in mind.

**6.** A factual assertion that Appellant appears to have maintained throughout the litigation of the present case is that, up until the time of being ordered to do so, he has never provided child support per se, that whatever monetary contributions he made were not directly in support of the children. *See, e.g., supra* note 2 and accompanying text.

Appellee requested in her "Supplemental Complaint for Absolute Divorce and Other Relief," filed April 16, 1998, that the court order Appellant to continue to pay child support under a theory of equitable estoppel. Specifically, Appellee argued that, because Appellant "was aware that he was not the natural father of the two minor children born during the marriage, . . . held himself out as the children's father and has contributed to the monetary and non-monetary support of the minor children both during the time that the parties lived together as husband and wife and after the parties separated," and because "[f]or the children's entire life, they have believed that [Appellant] is their father and have maintained a relationship in that capacity throughout and until the filing of this [litigation]," the court should rule that Appellant "by virtue of his actions is estopped from denying that he is the 'father' of the two minor children."

Appellant filed a written response denying that he was aware of his non-paternity and that he held himself out as the girls' father, asserting that his monetary and non-monetary contributions were directed "to the support of the marriage," as opposed, presumably, to the support of the children, and stating that he could "not attest to what the minor children of [Appellee] believed." In addition, Appellant highlighted and incorporated the Circuit Court's March 9, 1998 order, which he characterized as "finding that [Appellant] is *not* the biological father" of the two girls. Appellant further asserted that, because he does not fit within the definition of a "parent" under the Child Support statute, he "therefore is not legally responsible for the payment of child support, as a 'parent.' " Finally, Appellant pointed out that Appellee's formulation of a child support obligation on his part under a theory of estoppel was made "without providing any legal authority for such an assertion." In a subsequent filing, Appellant reasserted his demand that a blood test be performed on all the pertinent persons, as noted above.

On May 8, 1998, the Circuit Court ordered that the case be set for hearing "on all open matters." Accordingly, on December 7, 1998, the Circuit Court held a hearing. The court

filed a written opinion on December 23, 1998, holding that Appellant is equitably estopped from denying paternity of the twin girls. Thereafter, the court issued a "Judgment of Absolute Divorce," stating that "all issues pertaining to the [twin girls born during the course of the parties' marriage] will be addressed by this Court in a separate order. . . ." On January 16, 1999, Appellant first filed a Notice of Appeal, "from the final judgment entered in this action on December 28, 1998," referring to the Circuit Court's Judgment of Absolute Divorce. The record then indicates that, on February 5, 1999, the Circuit Court called the Markovs' case for a "Hearing on Support," that counsel were heard, that an agreement was placed on the record, and that Appellee's counsel was to prepare an appropriate order.

On May 3, 1999, the Circuit Court issued an "Earnings Withholding Order," requiring Appellant to pay Appellee the sum of $697.36 per month or the sum of $162.18 per week for the support of "the parties' minor children, namely Amanda Markov and Kelly Markov." Twenty-five days later, on May 28, 1999, Appellant filed a second Notice of Appeal, "from the final judgment entered in this action on May 3, 1999." Prior to a decision by the Court of Special Appeals, this Court granted a writ of certiorari on its own initiative.

### Analysis

It behooves us to address two preliminary matters before reviewing the Circuit Court's finding of equitable estoppel in the present case. First, we conclude that it was beyond the authority of the Circuit Court to declare, by way of a preliminary order in Appellee's divorce proceeding, that Appellant is not the biological father of the twin girls. With respect to the issue now before this Court, the task of the trial court, as placed upon it by Appellee's divorce action and her related claims, concerned only whether Appellant has a duty to pay child support. Under the circumstances that Appellant's putative paternity, albeit a question of fact strenuously and repeatedly denied by both parties, was undeniably not the basis upon which Appellee asserted that Appellant had a duty

to pay child support, and particularly where the Circuit Court was without the benefit of a blood test or other scientific investigation, it was error for the judge to announce a ruling as to Appellant's non-paternity.

Indeed, under the centuries-old common law rule first promulgated by Lord Mansfield in 1777, a child born of a married woman is presumed to be the legitimate offspring of her husband. *See Goodright v. Moss,* 2 Cowp. 591, 592–94, 98 Eng. Rep. 1257, 1258 (1777) ("The law of England is clear that the declarations of a father or mother cannot be admitted to bastardize the issue born after marriage.... As to the time of the birth, the father and mother are the most proper witnesses to prove it. But it is a rule founded in decency, morality, and policy, that they shall not be permitted to say after marriage that they have had no connection, and therefore that the offspring is spurious."); *see also Hale v. State,* 175 Md. 319, 323, 2 A.2d 17, 19 (1938) ("[Lord Mansfield's Rule] has been adopted in Maryland and in many other states; however, qualifications have been applied to the rule, so rationalizing it that, in this state and elsewhere, the presumption of legitimacy may be overcome when common sense and reason requires that departure."); *Staley v. Staley,* 25 Md. App. 99, 102–03, 335 A.2d 114, 117 (1975) ("[Lord Mansfield's Rule], as formulated in Maryland, created a presumption that the child of a married woman was the legitimate issue of her husband, which presumption could be rebutted by clear and convincing testimony of a person other than the husband or mother, that the husband did not have intercourse with the mother at a time when conception of the child in question would have been possible."). The General Assembly has codified this common law rule in two separate statutes as a rebuttable presumption. *See* Maryland Code (1997, 1999 Repl.Vol., 1999 Cum.Supp.) § 5–1027(c)(1) of the Family Law Article ("There is a rebuttable presumption that the child is the legitimate child of the man to whom its mother was married at the time of conception."); Maryland Code (1974, 1991 Repl.Vol., 1999 Cum.Supp.) § 1–206(a) of the Estates and

Trusts Article ("A child born or conceived during a marriage is presumed to be the legitimate child of both spouses.").

It thus cannot be denied that there existed at the beginning of this case a presumption that Amanda and Kelly Markov are the biological children of Appellant given the undisputed fact that they were both conceived and born during the parties' marriage. Nevertheless, that presumption was rebutted for purposes of the present case when, two months after filing her initial complaint, Appellee answered Appellant's motion requesting a blood test, stipulating that he was not the father. Ever since that time, Appellee has exclusively relied upon the doctrine of equitable estoppel as the *singular* basis for the alleged duty of Appellant to support the two girls, explicitly eschewing any claim that Appellant owes a duty of support based upon a biological relationship to the twins. It consequently misses the mark for Appellant, or any court hearing the parties' dispute, to focus upon the paternity *vel non* of Appellant, whether born of any common law or statutory presumption or to be induced from the result of a scientific test. For purposes of this litigation, paternity is simply not an issue in the present case.

Finally, the Circuit Court's declaration of non-paternity in the manner it chose, outside of the statutory scheme for paternity actions found in Maryland Code (1984, 1999 Repl. Vol., 1999 Cum.Supp.) §§ 5–1001 to 5–1048 of the Family Law Article would seem to thwart the apparent protections of the children's interests that inhere in the regular, quasi-mandatory involvement of the Office of the State's Attorney in such proceedings.[7] Even more deleterious to the children's interests, if not an outright obviation of them, is the preclusive effect potentially wrought by the court's declaration of Appellant's non-paternity upon any paternity action that the girls

---

7. For instance, § 5–1010(e)(2)(ii) requires that, ordinarily, a mother may file a paternity action only with the express consent of the State's Attorney, unless certain conditions are met. Moreover, such a paternity action may not be dismissed voluntarily without the consent of the State's Attorney except "by an order of the court for good cause shown." § 5–1010(e)(3).

might later choose to file. *See Jessica G. v. Hector M.,* 337 Md. 388, 400, 653 A.2d 922, 928 (1995) (while finding it unnecessary to decide the issue, nonetheless noting that "the vast majority [of jurisdictions outside Maryland] follow the proposition that when there is an actual factual determination of non-paternity in a paternity suit by the child's mother, then the child is forever bound by that factual finding").

Because the present case was not prosecuted as a paternity action, because Appellee, as well as the court, treated the issue of paternity as a matter for stipulated denial rather than as a factual matter needing to be investigated and determined, whether by rebuttable presumption, scientific inquiry, or otherwise, and because there were other competing interests involved in the present case yet perhaps unrepresented, namely, those of the twin girls, the court's declaration of non-paternity was error. We therefore shall direct the Circuit Court to vacate that portion of its March 9, 1998 order declaring that Appellant is not the biological father of Amanda and Kelly Markov.[8] *Cf. In re Adoption/Guardianship No. 10935,* 342 Md. 615, 631, 679 A.2d 530, 537 (1996) (holding that "the only dispute in this case relates to a matter which was not properly an issue, namely the duty of support" and modifying the lower court's order "to make it clear that the order does not represent any adjudication whatsoever with respect to the duty of support").

---

**8.** By the same token, no precedential value should be given to the Circuit Court's statement in its opinion in the present case that Appellant "is not factually the natural father." With a certain degree of disingenuousness, Appellee has stated to this Court that "one of the truly interesting things about this case is that there is still no proof that the children are not Appellant's biological children. When Appellant sought a blood test, Appellee did not oppose it. So, while there has been a court order determining paternity, science has never been given the opportunity to make a final determination." (Brief for Appellee at 5, n. 1.) We think it paramountly clear from the record, as our discussion above indicates, that Appellee offered substantial opposition to the ordering of a blood test by the Circuit Court. *See, e.g., supra* note 3. Moreover, it is Appellee's stipulation as to Appellant's non-paternity and her exclusive reliance on equitable estoppel that rendered a scientific determination of Appellant's paternity *vel non* of the twin girls unnecessary for resolution of the narrow issue before the Court.

The irrelevancy of paternity in the present case likewise lies at the heart of the second preliminary matter calling our attention, namely that the Circuit Court incorrectly formulated its equitable estoppel of Appellant in terms of a denial of paternity rather than on the proper issue, that of denying a duty to pay child support. It is perhaps understandable that the trial court would couch the issue in such fashion. Many courts that have addressed the issue of equitable estoppel in the context of a child support proceeding have done the same. *See Knill v. Knill*, 306 Md. 527, 532–34, 510 A.2d 546, 548–49 (1986) (discussing and citing many cases outside of Maryland relating equitable estoppel in child support dispute to denial of paternity). Nevertheless, this Court couched the decision in *Knill* not in terms of a denial of paternity but strictly in terms of an equitable estoppel to deny a duty to pay child support, holding that Appellant was "not equitably estopped to deny a duty to support." *Id.* at 539, 510 A.2d at 552. It was therefore incumbent upon the Circuit Court to tailor its finding of equitable estoppel in the same manner.

 The appropriate contours for a trial court's finding of equitable estoppel in a child support action have been set out in *Knill*. *See id.* at 536, 510 A.2d at 550. This Court, after reiterating that the essential elements of equitable estoppel are " 'voluntary conduct' or representation, reliance, and detriment," *id.* at 535, 510 A.2d at 550, held that the type of detriment that must be established in order to give rise to equitable estoppel in an action for child support is a financial loss. *See id.* at 538, 510 A.2d at 552. Quite importantly, this Court reiterated in *Travelers v. Nationwide*, 244 Md. 401, 224 A.2d 285 (1966), that "[w]e have repeatedly stated that whether or not an estoppel exists is *a question of fact* to be determined in each case." *Id.* at 414, 224 A.2d at 292 (emphasis added) (citing *Gould v. Transamerican Associates*, 224 Md. 285, 297, 167 A.2d 905, 911 (1961); *Liberty Mut. Ins. Co. v. American Auto. Ins. Co.*, 220 Md. 497, 501, 154 A.2d 826 (1959); and cases cited therein).

Based upon the evidence presented in the instant case, the Circuit Court found as a matter of fact that an equitable estoppel existed. It is apparent from its written opinion in the instant case that the court was aware of and correctly understood the required elements for equitable estoppel in the context of a child support proceeding. Neither party disputes this proposition.[9] What is disputed by the parties is the correctness *vel non* of the court's application of those legal principles to the facts presented. Our only task then is to scrutinize whether there was sufficient evidence before the trial court to support its finding of equitable estoppel in the present case.

■ Having fully reviewed the record, we find that sufficient evidence was presented to the Circuit Court to support the conclusion that Appellee and her twin daughters reasonably relied upon Appellant's conduct and verbal representations that he would provide for the support of the girls for as long as necessary.[10] In his deposition, Appellant indicated that he suspected from the time that he was informed of Appellee's pregnancy that he was not the responsible party and that, by the time that the twin girls were born, he was convinced that he was not their biological father. Even so, Appellant admitted that he led others to believe that the doctor who had performed his vasectomy had confirmed that he was capable of siring the children because one of the vas had reconnected. Appellee testified that, shortly after she announced her pregnancy, Appellant told her the same, lead-

---

9. In citing our decision in *Knill*, 306 Md. at 535, 510 A.2d at 550, the Circuit Court wrote that the three elements of equitable estoppel in Maryland are "a representation, release, and detriment." Even Appellant concedes, however, that the trial court's use of the term "release" was merely an innocent misnomer for the actual requirement of "reliance."

10. We note that, although Appellant contested virtually every aspect of Appellee's pretrial declarations and trial testimony, it is clear from its judgment in the present case that the Circuit Court did not find sufficiently credible Appellant's version of the events, actions, and conversations pertinent to the court's consideration of a non-paternity-based duty of child support on his part.

ing her to believe that he might be the father despite her as yet unrevealed sexual relations with another man. When she discovered that she was pregnant with twins, Appellee became even more convinced that Appellant could well be the father in light of his having previously fathered a set of twins with a high school girlfriend. Despite his early suspicions and later personal conviction to the contrary, Appellant allowed himself to be named as the twins' father on their birth certificate.

Four-and-a-half to five-and-a-half years of the parties' living together as the married parents of the twin girls passed before the possibility once again arose—and, according to the parties, the permanent realization set in—that Appellant was not the girls' biological father. It was then that Appellant confronted Appellee with information that he had learned from his sister as to the dubiousness of his paternity of the two girls. During the ensuing conversation, Appellee confessed that she had been involved in the extramarital relationship shortly after the wedding, and Appellant revealed that his rendition of a reconnection was mere ruse. Moreover, Appellee testified that, during this telling conversation, Appellant stated that "he had always known that he was not [the girls'] father, and that he intended to raise these children as his own." Appellee also testified that the two parties at that point discussed adoption for the one and only time but that Appellant assured her that no adoption was required because he intended to raise the girls as his own, and that all that an adoption would entail was an "unnecessary legal fee."

Further evidence was presented that, during the successive years, up until October of 1997, despite the parties' periodic separations and reconciliations, Appellant continued to provide for the support of the two girls even during his absences. In addition, he continuously insisted that he desired to treat and raise the twins as if they were his biological children. In fact, testified Appellee, on the occasion of "each and every" separation save the last, permanent one, she offered Appellant the opportunity to "tell the girls the truth" and to "walk away as their biological father." Appellant "remained adamant," however, insisting "that he did not want the children to know any

different," that Appellee "was to have no contact with their natural father," and that the girls should "only know him as their father." Furthermore, up until the time of the parties' permanent separation, Appellant "was a good father" to the twins, spent "a lot of time with them," and was very "involved in their lives." Even after the final separation in March of 1997, until the following October, Appellant "visited regularly with the kids," "talked to them almost on a daily basis," and "paid [Appellee] child support." For Christmas that year, he gave the girls presents and hosted a birthday party for them. He continued his visitations with the children until April of 1998, when he took them out for Easter. It was not until May 20, 1998 that Appellant terminated his relationship with the girls, telling them that, on the advice of his attorney, he had to discontinue all contact with them. Thus, Appellant's paternal interaction with Amanda and Kelly lasted over eleven years.

On cross-examination, Appellee repeatedly denied that Appellant encouraged her during their marriage to "go after [the biological father] for child support." She stated that the first time he mentioned taking such action did not occur until October of 1997. When pressed as to why she never searched on her own for the alleged biological father, Steven Mayo, in order to obtain child support for the girls from him, Appellee responded:

> Each time we separated, we talked extensively about whether or not [Appellant] would continue to be their father. I gave him ample opportunity over and over again to back down. He is the one that insisted I not find the biological father. He is the one that insisted. He continued the role that he portrayed.

Finally, when asked why she did not pursue Mr. Mayo even after it became "crystal clear" to her that Appellant could not be the girls' father, on account of his revelation that his vasectomy had not reversed and that he "still was sterile," Appellee answered once again that she "did not at the request of [her] husband."

The preceding evidence, absent any indication of a legal infirmity barring the fact-finder from believing it, amply supports the conclusion that Appellee reasonably relied upon Appellant's conduct and words as assurance that he would provide the necessary support of Amanda and Kelly through and to the end of their childhood. Appellee thus presented to the Circuit Court sufficient evidence to establish representation and reliance, the first two elements of equitable estoppel. *See Knill,* 306 Md. at 535, 510 A.2d at 550.

█ The evidence was insufficient, however, under the standard we set out in *Knill,* to establish the financial detriment required to give rise to equitable estoppel in an action for child support. *See id.* at 538, 510 A.2d at 552. Although the Circuit Court expressed "extreme doubt that [the biological father] could be located at this period of time," such doubt is not supported by the record in this case in light of the facts known to the parties and given the breadth of information available through today's technology. We therefore conclude that, under the circumstances of the present case, the trial court's finding of fact as to the inability to locate the presumed natural father is untenable.

The trial judge explained that "Mrs. Markov knew the name of her lover, but is not sure it was correct. She went to where he lived for the assignation, but was too drunk to remember the number. She believes he was a student at University of Maryland Baltimore Campus." It also seems that the court based its conclusion in part upon the mere passage of time as an insurmountable impediment to locating the putative biological father, Steven Mayo.

To be sure, there is some doubt as to whether the twin girls' supposed natural father can be located for purposes of initiating a paternity/child support proceeding against him. The existence of such abstract uncertainty, however, cannot suffice to establish as a matter of fact the financial detriment prerequisite to a finding of equitable estoppel with respect to a purported child support obligation on the part of a nonbiological parent. Before such an obligation may justifiably be

placed upon a person not ordinarily so obliged, it is incumbent upon Appellee to demonstrate more substantially that she was and remains unable to locate the putative biological father in order to prove sufficiently that her reliance upon Appellant's prior conduct and verbal representations has resulted in a current or future financial loss, that is, a reasonable opportunity to procure support from the person other than herself who is primarily responsible for the support of her children. *See id.* at 531, 510 A.2d at 548 (reiterating that the "duty of child support extends to the natural parents of an illegitimate child, but not to a stepparent" (citing *Bledsoe v. Bledsoe,* 294 Md. 183, 448 A.2d 353 (1982); *Commonwealth of Virginia v. Autry,* 293 Md. 53, 441 A.2d 1056 (1982); *Brown v. Brown,* 287 Md. 273, 412 A.2d 396 (1980)))).

There simply has been no satisfactory proffer by Appellee, or other indication, of any effort to locate the twins' presumed biological father. In fact, Appellee concedes that she "never even tried to learn the identity of the twins' putative father, or to contact him." Brief for Appellee at 7. Based upon representations made by either or both of the parties, Appellee is aware of the man's name or possible name, his possible affiliation with the University of Maryland at Baltimore, the general whereabouts of his residence in Baltimore at the time of Appellees's encounter with him, and perhaps even the specific time period of their encounter. Yet, none of these leads seems to have been investigated, with reliance instead upon the facile assertion that these leads do not seem promising. Consequently, we shall order that the Circuit Court's finding of equitable estoppel and its subsequent judgment awarding Appellee child support be vacated.

In the interests of judicial economy, a remand is appropriate. In *Jessica G. v. Hector M.,* 337 Md. 388, 653 A.2d 922, (1995), this Court held, in accordance with the pellucid language of § 5–1038(b), "that *all* paternity orders except declarations of paternity can be modified or set aside 'in light of the circumstances and in the best interests of the child.'" *Id.* at 401, 653 A.2d at 928–29 (quoting § 5–1038(b)). We can fathom no reason why the same reasoning should not be applicable to

an order of child support, even if entered in a divorce proceeding rather than in a paternity action. Because the present case, as it stands before this Court, is essentially nothing more than an action for child support, even should Appellee be ultimately unsuccessful, her twin girls would nonetheless be able to file a separate action against Appellant seeking to set aside the court's order denying child support. Rather than prolonging the underlying dispute further than is necessary, we find it in the best interests of the children, Amanda and Kelly Markov, that the Circuit Court proceed with a rehearing in the present case to determine, consistent with this opinion, whether and on what basis Appellant owes a duty of support.

*JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY VACATED IN PART. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE DIVIDED EQUALLY.*

BELL, C.J., concurs in the judgment only.

ELDRIDGE, J., dissents and files opinion.

ELDRIDGE, Judge, dissenting:

Although there may be good reasons for requiring further circuit court proceedings in this case, I cannot agree with the Court's opinion which reaffirms *Knill v. Knill,* 306 Md. 527, 510 A.2d 546 (1986), and with the Court's judgment which requires further proceedings in accordance with its opinion. I continue to adhere to the principles set forth in Chief Judge Murphy's dissent in *Knill v. Knill, supra,* 306 Md. at 539–554, 510 A.2d at 552–560, which was joined by Judge Smith and myself.