DAVISSON A. BENSON *v.* FREDERICK Y. BORDEN, RECEIVER

[No. 36, January Term, 1938.]

*Decided April 8th, 1938.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Walter C. Capper* and *William S. Jenkins,* for the appellant.

*William C. Walsh* and *W. Earle Cobey,* for the appellee.

MITCHELL, J., delivered the opinion of the Court.

The appeal in this case is from a decree of the Circuit Court for Allegany county, passed on October 4th, 1937, in the matter of the receivership of the Big Savage Fire Brick Company. The decree rejected certain claims filed in said cause by the appellant and allowed certain claims of the receiver as against the appellant. It further allowed other claims filed in the cause by the appellant, and decreed that the latter allowances be set off against indebtedness found to be due by the appellant to the receiver; and, finally, decreed that the difference between the conflicting claims, as allowed, be held as a personal obligation of the appellant to the receiver.

The Big Savage Fire Brick Company, hereinafter designated as Company, was incorporated in 1902 for the purpose, as its corporate name implies, of engaging in the manufacture of bricks and burnt clay products; its plant and principle office being located in Allegany County. At the time of the incorporation, Davisson Armstrong was elected president and continued as such

until a short period before his death, which occurred on June 1st, 1935. The record reveals that Mr. Armstrong was at that time an active business man, and that he was connected with the Borden Mining Company and the Citizens' National Bank of Frostburg, in addition to his position as president of the Brick Company. He was eighty-six years of age at the time of his death, and, according to the testimony of his physician, he suffered from arteriosclerosis and advanced senility as far back as 1932, and his condition became serious upon the closing of the bank in 1933. At the time the Company was organized, John N. Benson, the father of the appellant, was elected vice-president and general manager of the Company, and held that position until his death, which occurred in 1919. The first official connection the appellant, Davisson A. Benson, Sr., had with the Company was that of secretary, and, upon the death of his father, he was elected vice-president and treasurer, in which position he also performed the duties of general manager.

It does not appear from the record what compensation the appellant originally received as vice-president and treasurer, but it does appear by resolution of the board of directors, passed on January 31st, 1934, that the salary of such officer was fixed at $5,000 per annum, accounting from January 1st, 1924; and there is no evidence in the record that that resolution was ever formally rescinded by the directors. It is conceded that the appellant received the full payment of his salary, on the above basis, until January 1st, 1928, and that after that date he drew, or was paid, irregular sums, as follows: 1928, $3,200; 1929, $1,800; 1930, $3,200; 1931, $1,800; 1932, $3,200; 1933, $1,800; 1934, $3,200; 1935, $1,800. His official position with the Company terminated on January 31st, 1936, and he received no salary payment for the latter month.

The Company met with reasonable success and paid dividends on its stock until 1927; after that year, however, it began to lose money and rapidly became involved.

In January, 1936, the appellant and his son, D. A. Benson, Jr., were ousted as directors of the Company, and this action was followed by the appointment of Frederick Y. Borden, the appellee, as receiver for the Company, by the Circuit Court for Allegany County, which assumed jurisdiction in the premises on January 31st, 1936.

In response to a general notice of the receiver to the creditors of the Company to file their respective claims in the above proceedings, the appellant filed claims as follows:

| | |
|---|---:|
| Open account for unpaid salary | $20,416.66 |
| Open account for bills paid on behalf of the Company, by the appellant | 117.62 |
| Principal note indebtedness due appellant | 10,000.00 |
| Interest on above notes to July 1, 1936 | 692.27 |
| Royalty on coal furnished the Company by the appellant, accounting from January 1, 1928, to January 31, 1936 | 19,327.35 |
| Total | $50,553.90 |

In addition to the above, the appellant, on his own behalf and on behalf of F. A. Buchholz, a former director of the Company, filed a promissory note held by them jointly, as follows:

| | |
|---|---:|
| Principal of note | $5,000.00 |
| Interest to July 1, 1936 | 259.02 |
| Total | $5,259.02 |

It may be here noted that, at the hearing in the lower court, it was shown by the records of the Company that additional sums collected by the appellant as payments to him on account of coal royalties alleged to be due him were not credited on the coal account as filed, whereupon the appellant corrected the claim by allowing said credits in the aggregate sum of $3,445.26.

To summarize, therefore, the total indebtedness, as

corrected, claimed by the appellant against the receiver, is as follows:

| | | |
|---|---|---:|
| (a) | Open account for unpaid salary | $20,416.66 |
| (b) | Open account for bills paid | 117.62 |
| (c) | Adjusted coal royalty account | 15,882.09 |
| (d) | Company notes held individually, plus interest thereon | 10,692.27 |
| (e) | One-half of Company's note, held jointly, plus interest thereon | 2,629.51 |
| | Total | $49,738.15 |

Exceptions to the allowance of claims (a) and (c) were filed by the receiver as follows:

(a) Because the appellant at the time he ceased to draw the full salary of $5,000 per annum, as originally authorized by resolution of the board of directors in 1924, was in sole control of the operation and management of the Company, due to the illness of its president; that the salary was not paid in full because it was not earned and could not therefore be collected; that no claim for balance due on salary was ever set up on the books of the Company, which were kept under the direction of the appellant, until they were audited in 1935, shortly before the receivership; that meanwhile, acting as president of the Company, the appellant caused financial statements to be annually presented to its stockholders, which did not reflect the liability indicated, and that, as acting president and general manager, he furnished creditors with financial statements relating to its affairs, which did not include such liability. For these reasons, it is alleged that the actions of the appellant show that there was an implied reduction in his salary, which was acquiesced in and ratified by the directors and stockholders and himself; it being further alleged that the transaction between the appellant and the Company, for which he was acting in this regard, constituted an abandonment or waiver of the salary balances, and that, having waived and abandoned such claims, he cannot now assert the same against the Company.

(c) Because a part or all of the equipment used in the coal mine of the appellant was purchased and paid for by the Company; that in any event its books showed that an electric hoist used in the coal mine was purchased and paid for with its funds; that the foreman of the coal mine was the same person in charge of the Company's clay mine, his entire salary being paid by the Company; that all electric power used in the mine was paid for by the Company; that equipment and materials used in the operations of the coal mine were repaired and replaced at the Company's expense. That its books showed that the appellant received monthly payments for coal until 1928, since which time no further regular payments were made, and that the costs of all mining operations, including workmen's compensation insurance, were paid directly by the Company and carried on its books as current liability; that, during the period since 1928, no account payable was set up on the books representing royalty or profits due the appellant, although the said books during the entire period were kept under the exclusive direction and control of the appellant. It is further alleged in this connection that the annual reports submitted under the direction of the appellant showed no such liability, and that during the year 1935, while acting as president, the appellant prepared and furnished to certain creditors, namely, Borden Mining Company, lessor of the coal mine, and Thomas B. Finan, receiver of the Citizens' National Bank of Frostburg, financial statements which failed to show any liability to the appellant for the coal royalties now claimed; and, further, that the minutes of the directors fail to show that any royalty contract was entered into between the appellant and the Company, or approved and ratified by the directors.

As to the loan, and advance payment on open account indebtedness, claimed under designations (b), (d), and (e), objection was made to the payment because of a counterclaim or set-off, alleged to be due by the appellant to the receiver, for wages paid servants employed

in the home of the appellant by the Company from the year 1922 to 1935, amounting approximately to the sum of $9,297.50; it being set forth, in the receiver's objections and exceptions, that no authorization for such payments, in the nature of additional compensation to the appellant, was ever granted by the Company's directors.

It was further claimed by the receiver that the Brick Company sustained other losses through the organization of an independent corporation by the appellant, the same being known as "Standard Arch Company"; that the expenses incident to its operations were paid from funds belonging solely to the Brick Company, at the instance of the appellant, and that these losses were properly chargeable as a set-off against any sum found to be due the appellant.

The answer of the appellant to the exceptions of the receiver, in substance, sets forth:

(a) A general denial that the appellant acted as president of the Company or was in sole control of its operations from 1928 to 1935; and the assertion that Mr. Armstrong actively performed the duties of president and director and was fully cognizant of all of its affairs until the date of his death.

(b) Denial of any agreement to a reduction in salary, alleging that, during the period covered by the claim and down to the date of the receivership, the directors of the Company had knowledge that the full salary was not being paid; that they agreed, from time to time, that it be paid, and that the appellant at no time waived or abandoned the same.

(c) Assertion that during all the period covered by the coal claim, the directors of the Brick Company had knowledge that the coal was being used from the mine under an agreement that the Company would pay for the same at some later date; that the reason payment was not demanded was because of the financial condition of the Company, and that at no time did he waive payment. Further answering, the appellant denied that the equipment used in the coal mine was paid for by

the Brick Company. He admitted that the electric hoist did belong to the latter company and was in the coal mine, but denied that it was ever used in the mining operations.

(d) It was admitted in the answer that the annual reports and statements submitted by the appellant to directors and stockholders did not show the salary and coal claims, but alleged that those connected with the company were informed of these claims, and advised that the reason they were not being paid was because of the financial status of the organization, and that the directors acquiesced in such action.

(e) The appellant denied the right of the receiver to a set-off by reason of the payments by the Company of wages of servants employed in the home of the appellant, and submitted that such payments had been made over a period of thirty years with the acquiescence and approval of the stockholders and directors; that his predecessor had enjoyed the same concession, and that said servants also, from time to time, engaged in work for the Company.

Under this state of the pleadings, testimony was taken in open court by the respective parties; the receiver adducing evidence tending to prove that the president, Mr. Armstrong, died at the age of eighty-six years, and was both mentally and physically incapacitated for business service several years before his death; that meanwhile the business of the Company was conducted as a one man corporation by the appellant, and that the directors met at irregular intervals; that information as to the true status of the affairs of the Company was withheld from them; that the appellant had stated on two occasions that he was taking a cut in his salary, the occasions being when he notified other employees of the necessity for successive reductions in wages; that the books of the Company were kept under the appellant's direction by his niece; that no audit was made of them until as late as 1935, and only then because of pressure from creditors; that, during the course of his control

and management, the appellant made application for loans to the Company from a Federal Reserve Bank, and from the Reconstruction Finance Corporation, and, in statements furnished under oath by him for the purpose of obtaining said loans, did not set up any liability for the personal indebtedness he now claims against the Company. Nor did he claim the said indebtedness as an asset in his personal statements also furnished and sworn to in connection with said applications. That the alleged claims were not shown in financial statements made by the appellant and filed under oath with federal income tax reports of the Company from 1928 to 1935; that similar omissions of the claims were made in statements furnished creditors of the Company as set forth in the objections; that the appellant used bricks from the Company's plant of the approximate value of $585 for his personal purposes and did not pay for the same; and, generally, the receiver offered evidence in support of all allegations set forth in his objections.

The appellant, testifying on his own behalf, explained that the reason the salary account was not kept current was because the earnings of the Company ceased to be such as to permit regular monthly payments, and, in defense of that claim, stated that the matter was brought to the attention of the president and the directors from time to time, and that it was always understood that he would be eventually paid. John R. Atkinson, a former director, testified that the appellant did bring the matter of his salary claim before the board of directors some time in 1934 and 1935. He also testified that at that time the board was aware of the salary claim and agreed that it be paid, but he did not know the amount then claimed. On cross-examination he stated that he never noticed any charge for salary or coal on statements furnished the directors. He did not know of any agreement with the Company relating to coal profits, and, as far as he knew, there were never any minutes made as to the amounts claimed to be due by the Company to the appellant. He also testified that

for the past ten years the affairs of the Brick Company were almost entirely in the hands of the appellant.

On the other hand, Lawrence D. Willison, another director up to 1934, testified that the appellant stated that the Company owed him money, but that he never knew that the appellant was being paid for coal from the mine; nor did he know that the Company carried on its payroll an employee who worked as a servant at the home of the appellant.

With reference to the coal account, the appellant testified that in 1921 he acquired individual control of a coal mine located in close proximity to the Brick Company's plant through a lease from Mr. Armstrong, the president of the Brick Company, who at that time represented the Borden Mining Company, the lessor; that he equipped the mine and started its operations at his own expense, and later began to supply the Brick Company with coal used in its operations. That the coal was regularly paid for at an agreed price until January, 1928, and that the bookkeeper of the Brick Company also kept the books of the "D. A. Benson Coal Mine." He further testified that in January, 1928, he ceased to operate the coal mine, and, under a verbal agreement or understanding with Mr. Armstrong, acting as president, it was operated by the Company; the appellant to be paid the sum of $2.20 per ton for all coal taken from the mine, less, however, the cost per ton for mining the same. The witness stated that at the time of the agreement with Mr. Armstrong the market price for the grade of coal found in his mine was $2.20 per ton, and that he had received no payments under the royalty agreement except some minor credits for current mine expenses. As has been noted, however, other substantial credits were shown by the receiver, and the account as originally filed accordingly amended.

The appellant admitted his participation in the preparation of financial statements relating to the affairs of the Company for submission to its stockholders, directors, and creditors, and to the Federal Reserve Bank of

Richmond, Virginia, and the Federal Reconstruction Finance Corporation, for the purpose of securing loans from the latter two governmental agencies. He further admitted the preparation of income tax reports for both the Company and himself. Most of these papers were signed by him in his official capacity and sworn to by him, and in none of them do the salary and coal royalty items appear as liabilities of the Company, or as accounts receivable in his own income tax returns. Furthermore, no minute appears on the records of the meetings of the board of directors relating to these items.

In explanation of the item of servant's wages, which was pleaded as an offset to his claims against the Company, the appellant testified that, when his father was vice-president and general manager of the Company, through Mr. Armstrong, the president, or at least with his acquiescence, an old colored servant was employed at the expense of the Company; that later his father lived with the appellant, and that the latter kept the servant on the payroll "as a sort of pension to run errands." From time to time others were employed, but at no time was there more than one such employee on the pay roll, and the custom was continued by the appellant until the receivership. This testimony was not denied. There is no minute showing authority for this transaction, but it prevailed from almost the beginning to the end of the Company's activities, and the name of the respective employees regularly appeared on the pay roll as such. Miss Clark, the bookkeeper over a long period of years, testified that at least one of the men so employed for a time worked for the Company in its clay mine; while on the other hand, Miss Wilson, the pay-roll keeper since 1925, testified that none of them, to her knowledge, worked in the Company's plant. She corroborated Miss Clark in that the names of these servants regularly appeared on the pay roll. Miss Clark also stated that they were paid the same wage paid other laborers in the Company's employ.

No audit was made of the Company's books until in 1935, and this was not done until after that action was demanded by Thomas B. Finan, the receiver of the Citizens' National Bank of Frostburg, and Frederick Y. Borden, a director of the Borden Mining Company, both corporations being large creditors of the Brick Company.

(1) The decree of the learned chancellor below overruled the receiver's exceptions to the allowance of the indebtedness claimed by the appellant against the receiver, as found in the summary hereinbefore set forth under item (b), and allowed the account as a valid claim against the receiver in the sum of $117.62.

(2) It also overruled the exceptions to the allowance of the indebtedness claimed as found in said summary under item (d), and allowed the principal of the promissory notes evidencing said indebtedness, in the sum of $10,000 plus interest at the rates stipulated in the notes, from their respective dates.

(3) It also overruled the exceptions to the allowance of the indebtedness claimed, as found in said summary under item (e), and allowed one-half of the principal of the note evidencing said indebtedness, or the sum of $2,500 plus one-half of the interest at the rate stipulated in the note, from its date.

(4) It sustained the exceptions to the allowance of the indebtedness claimed, as found in said summary under item (a), to the extent of $20,000, and overruled the same as to $416.66, which it allowed in payment of one month's salary of the appellant, accounting from January 1st, 1936, to January 31st, 1936.

(5) And it sustained the exceptions to the allowance of the indebtedness in the sum of $15,882.09, as found in said summary under item (c), (the original item as filed and as set forth in the decree having been $19,327.35).

To recapitulate, dealing with principal only, the claims allowed the appellant by the decree are as follows:

Note indebtedness .................................................. $10,000.00
Joint note indebtedness................................... 2,500.00

Open account for advances............................ 117.62
Salary account............................................ 416.66

Total............................................................ $13,034.28

The chancellor by said decree allowed the receiver to set off the above award, plus interest on the note indebtedness, with the following items which he found and decreed to be due by the appellant to the receiver:

For domestic servant employed at the home of the appellant from 1922 to 1935 .............................................. $ 9,297.50
For bricks used for personal purposes...... 585.00
Refund for profit on coal furnished the Company from 1924 to 1928...................... 10,599.22

Total............................................................ $20,481.72

The decree further provides that "any part of the counterclaims * * * not needed to offset the allowed claims of D. A. Benson, Sr., against the Big Savage Brick Company are hereby declared personal obligations of the said D. A. Benson, Sr., due and owing to the Big Savage Brick Company."

A careful examination of the record leads to at least one conclusion, and that is that the appellant, for a number of years prior to the receivership, dealt with the affairs of the Company as though the corporation was his own private organization. The meetings of the directors were held at irregular intervals; the minutes of that body were not kept so as to show what, if any, consideration was given to vital matters concerning the management and operation of the corporation.

As has been noted, the president, Davisson Armstrong, was a man of other business connections, far advanced in years. According to his physician, Dr. W. O. McLane, Jr., he was a patient of the doctor's father prior to 1932, and from June, 1932, to the date of his death in 1935, he was under the treatment of the younger physician. Dr. McLane, Jr., testified as follows: "I noticed a physical or mental change in him at or about the time

of the closing of the Citizens' National Bank of Frostburg and the bank holiday, which became effective in the early part of March, 1933." He diagnosed the case as a condition of advanced arteriosclerosis and senility and expressed the opinion that in 1933 Mr. Armstrong was mentally incapable. Describing his physical condition, the doctor stated: "He had to be carried in and out of the automobile. He was very feeble on his legs, and could scarcely walk. He was blind in one eye on account of a cataract. A cataract had been removed from the other eye, but he couldn't recognize me standing at the foot of the bed. I never saw him read a paper." This was the condition of the president of the Company for approximately three years before his death at the age of eighty-six; and, according to the only medical testimony found in the record, he was failing, and naturally so, before that time. It is obvious, therefore, that the supposed executive head of the corporation was not active in the latter years of its operations, and yet the gist of the appellant's testimony is to the effect that he is entitled to the payment of back salary and coal royalty claims, because of a verbal understanding with the former president, to whose attention he had directed the matter on several occasions.

We have only to refer to the testimony of the two directors of the Company, hereinbefore detailed, to justify the conviction that the board of directors was not properly advised of the true financial status of the Company, and that its members knew practically nothing about the alleged salary and coal accounts.

The period from January 1st, 1928, to January 31st, 1936, according to the testimony of the appellant, was the period in which coal was used under the alleged royalty arrangement. There is no supporting testimony as to the royalty agreement, however, and no documentary proof except bills made up by the bookkeeper under the appellant's direction. These bills are based on a gross cost price of $2.20 per ton, less operating costs admittedly paid by the Company. The appellant, under

the royalty arrangement, was paid by the Company to the extent of $3,445.26, which he failed to credit on the coal bill as originally filed, and the bill as filed shows additional credits of $404.36, or a total royalty payment of $3,849.62.

Testimony as to whether there ever was any royalty contract is far from convincing; and further doubt is cast upon the coal transaction through the act of the appellant in filing a coal claim which, upon his own theory of the alleged agreement, he now admits over-charged the Company the sum of $3,445.26. The incident is further evidence of the loose management under which the Company was operated during a period in which it was steadily losing money, and in which he and his son were apparently the only stockholders or creditors on the pay roll.

It is our opinion, therefore, that under the facts disclosed in the record, the conclusion reached by the chancellor in rejecting the coal bill was correct. We are also of the opinion that there was no error in the ruling below under which the claim for salary in arrear was rejected. As has been noted, neither of these claims was ever set up on the books of the Company until in the latter part of 1935, when an audit was made upon the demand of creditors. Meanwhile, statements purporting to reflect the true financial status of the corporation were issued under the direction of the claimant. Some of these were under his oath, some of them were designed to allay the anxiety of existing creditors, and some of them were for the purpose of procuring loans to the Company. Other statements accompanied federal income tax reports, and on none of these appeared any reference to the alleged claims.

In the carefully prepared brief of the appellant, it is urged that these claims should be allowed, notwithstanding the above facts, because it is contended that no credit was procured upon the faith of the above statements and reports. It being a fact that no loans were procured from the Federal Reserve Bank or the Reconstruction

Finance Corporation, it is submitted that no one was induced to deal with the Company to his loss or detriment by reason of the admittedly misleading statements and reports circulated by its general manager. It is therefore further contended that the doctrine of equitable estoppel should not apply in this case. With this contention we do not agree, as the record is replete with testimony which shows that large creditors of the Brick Company were misled by these statements, to their ultimate detriment and loss, while at the time the appellant was profiting through the continued operations of the insolvent company. In other words, had the true financial condition of the Company been set forth in the statements, and the liabilities against it, for which the appellant now contends, been shown, the receivership would have been invoked by the creditors long before it was invoked by them. As stated by Sir James Fitzjames Stephen in his *Digest of the Law of Evidence,* p. 124: "When one person, by anything which he does or says, or abstains from doing or saying, intentionally causes or permits another person to believe a thing to be true, and to act upon said belief otherwise than but for that belief he would have acted, neither the person first mentioned nor his representative in interest is allowed, in any suit or proceeding between himself and such person or his representative in interest, to deny the truth of the thing." Additional credit does not appear to have been obtained for the Company through the circulation of the admittedly misleading statements; but there can be no doubt that these statements were the means by which the appellant procured the indulgence of the creditors and profited in the delayed receivership. In *Rodgers v. John,* 131 Md. 455, 102 A. 549, 551, after citing the principles of the doctrine of equitable estoppel as defined in 2 *Pomeroy's Equity Jurisprudence,* secs. 804 and 812, it is said: "Whether the doctrine should or should not be applied depends upon the facts and circumstances of each particular case, and unless the party against whom the doctrine has been invoked

has been guilty of some unconscientious, inequitable, or fraudulent act of commission or omission upon which another has relied and been misled to his injury, the doctrine will not be applied."

It is our conclusion that the facts and circumstances in the instant case warrant the application of the doctrine; and that conclusion is fortified by an inquiry as to whether the applicant is not precluded from asserting the coal and salary claims upon the principle of waiver. In this country "waiver" and "estoppel" are often used synonymously by courts and text writers, particularly in insurance law (*Vance on Insurance,* p. 343; *Ewart's Waiver Distributed,* p. 8), although the terms have separate and distinct functions, and the same set of facts may establish one but not the other. The confusion arising from the misapplication of these terms, and their relation to "election," "release" and "contract," is described in an exhaustive collation and analysis of authorities and reported cases in *Ewart's Waiver Distributed;* and the demarcation between "waiver" and "estoppel" is lucidly delineated in 40 *Cyc.* 255, as follows: "While waiver belongs to the family of estoppel, and the doctrine of estoppel lies at the foundation of the law of waiver, they are nevertheless distinguishable terms. * * * Waiver is the voluntary surrender of a right; estoppel is the inhibition to assert it from the mischief that has followed. Waiver involves both knowledge and intention; estoppel may arise where there is no intent to mislead. Waiver depends upon what one himself intends to do; estoppel depends rather upon what he causes his adversary to do. Waiver involves the acts and conduct of only one of the parties; estoppel involves the conduct of both. A waiver does not necessarily imply that one has been misled to his prejudice or into an altered position; an estoppel always involves this element. * * * Estoppel may carry the implication of fraud, waiver does not. A waiver may be created by acts, conduct or declarations insufficient to create a technical estoppel."

In the case before us, if the situation, condition, and

conduct of the parties were not sufficient to bar the allowance of the alleged claims upon the ground that the appellant was estopped to assert the same, it is our further conclusion that by his acts and conduct, which formed part of the basis for declaring the existence of estoppel, he had taken such a position as, without regard to any influence upon or change of position on the part of others, would have justified the chancellor in decreeing that the appellant had voluntarily waived the right to collect the coal and salary claims; such waiver having, in effect, modified to that extent any contract he may previously have had with the Company with reference to the subjects of either of the claims. The conclusion that the appellant cannot sustain the claims by reason of his waiver thereof is an illustration of the close interrelation of waiver and estoppel; for, in substance, it is a finding that he is estopped to assert such claims because of having waived the same; in which connection the language of *Crosswell v. Connecticut Indemnities Assn.*, 51 S. C. 469, 478, 29 S. E. 236, 239, may be appropriately quoted as follows: "[Waiver is] the relinquishing, giving up, or surrendering some known legal right, [and] may be found to exist if one 'acts in such a way * * * that his conduct implies that he has waived his right,' and * * * 'amount[s] to a bar or obstruction when once established,' and * * * 'might be said to be an estoppel.' "

The appellant admits that he received bricks from the Company for his own personal use. The value of these are shown to have been $585, and he testified that the bricks were given him by the directors.

The minutes of the directors do not corroborate that statement, but there is no evidence to deny it, and, unlike the salary and coal royalty claims, the item was, at least, not a concealed alleged liability of the Company, designed to mislead its creditors and stockholders among whom the statements referred to herein were circulated. The receiver will, therefore, not be allowed the item now

under consideration as a set-off against the items allowed the appellant.

As to the other items allowed as set-offs by the chancellor, notwithstanding the above statement of the law, we are not in accord. The claim of set-off for reimbursement for servant's wages, as allowed by the court below, was $9,297.50, covering the period from 1922 to 1935, both inclusive. The item was proved for the years 1926 to 1935, both inclusive, to be $5,657.50; and the pay roll records prior to 1925 not being in the record, the amounts allowed for the years from 1922 to 1925, inclusive, were admittedly estimated by the chancellor. This estimate was arrived at because the appellant, after testifying that one employee, kept on the pay roll for thirty years, had rendered service at the place of abode of both his father, the then manager of the Company, and Mr. Armstrong, its then president, and had continued to render this service after Mr. Armstrong ceased to live with his father, stated that after his father's death he received the services as general manager. While it is true, as observed by the chancellor in his opinion, that there is no proof of any authorization by the directors for the employment of an extra man to render special service to the president or general manager, as compensation in addition to the salary of such officer or officers, it is nevertheless a fact that the practice began and continued while Mr. Armstrong was an active business man, engaged as the executive officer of the Company. The name, and the amount paid the particular employee, appeared regularly on the Company's pay roll; and it is a fair presumption that those who directed the affairs of the Company at the beginning of the employment of the extra man must have had knowledge of the transaction and acquiesced in the arrangement. Besides, it may be added, it was testified by the appellant, without contradiction, that the employee from time to time rendered service as a messenger for the general manager, and at other times worked with other laborers in the brick

plant. This testimony was to some extent corroborated by the bookkeeper. For these reasons, we are of the opinion that the set-off now under discussion should not be allowed.

The remaining set-off allowed by the decree of the lower court was the sum of $10,599.22. This amount represents a refund for profit or royalty on coal, which the chancellor found to have been collected by the appellant from the Company, and which under the decree is charged as an indebtedness in favor of the Company. It is significant that a corporation engaged in the manufacture of a product which required the consumption of many tons of coal in its daily operations should not have leased in its own name the coal mine from which the appellant furnished the coal. And especially is that observation apparent, when it is shown by the record that the lease for the coal mine was procured from the Borden Mining Company by the appellant through Mr. Armstrong, who in 1921, when the lease was made, represented the mining company and was at the same time president of the brick company. Nevertheless, this is the apparent fact revealed by the record; and the testimony of the appellant is that he developed the mine at his own expense, and that he supplied coal at an agreed price, for which he was regularly paid to January 1st, 1928. There is some evidence in the record that some machinery and labor of the Company were engaged in the mining operations during the period between 1924 and 1928, but the same was denied by the appellant; and in any event, the monthly bills for coal furnished were paid by the Company, without question, and at a time when Mr. Armstrong, as far as the record goes, was the active head of the corporation. Under this state of the record, we therefore reach the conclusion that there was error in requiring the appellant to refund the payments made to him from the time the Company began to receive coal from the mine until January 1st, 1928; and inasmuch as there is nothing found in the record to refute the statement of the appellant that he was the lessee of the coal

mine, we will allow him to retain $3,849.62 which he paid himself as royalty from January 1st, 1928, to the date of receivership.

> *Decree affirmed in part, and reversed in part, and cause remanded for further proceedings in conformity with this opinion; one-half of the costs to be paid by the appellant, and one-half to be paid by the appellee.*