O-S CORPORATION ET AL. *v.* SAMUEL A. KROLL, INC.

[No. 240, September Term, 1975.]

*Decided December 19, 1975.*

---

The cause was argued before MOYLAN, POWERS and LOWE, JJ.

*Donald N. Rothman* and *Lawrence S. Greenwald* for appellants.

*Mitchell Stevan,* with whom were *Sagner, Stevan & Harris* on the brief, for appellee.

LOWE, J., delivered the opinion of the Court.

A motion to vacate an arbitration award may give rise to an infrequent instance where even an equity court may not do equity. The Maryland Uniform Arbitration Act, codified as Subtitle 2, Title 3, of the Courts and Judicial Proceedings Act, provides that a court shall not vacate an award of arbitration "on the ground that a court of law or equity could not or would not grant the same relief." Cts. Art., Sec. 3-224 (c). This legislative limitation upon judicial review is premised upon the common law consideration of arbitration as a "favored" action,

> " . . . and the awards of arbitrators would not be set aside by the courts unless the arbitrator was guilty of fraud, misconduct or prejudice, had exceeded his authority, or had made a mistake in law or fact appearing on the face of the award." *Bel Pre Med. v. Frederick Contr.*, 21 Md. App. 307, 316, reversed on other grounds 274 Md. 307.

Adopting that concept statutorily, the General Assembly articulated it by restrictively defining the grounds upon which a court might vacate an award, and expressly

proscribed any possibility of substitution of a reviewing court's judgment for that of the arbitrators. Among the narrow grounds permitting vacation of an award by the courts are the two here in question.

Cts. Art., Sec. 3-224.

> "(b) *Grounds.* — The court shall vacate an award if:
>
> (1) An award was procured by corruption, fraud, *or other undue means;* . . . [or if]
>
> (3) The arbitrators exceeded their powers; . . . ." [Emphasis added].

At the heart of this appeal from the Circuit Court of Baltimore City is the question of whether either or both of these grounds permit judicial relief from an award for any reasons other than an apparent improbity. Is there judicial relief available from an arbitration award that was arrived at in good faith but, because of grossly misguided judgment, is shockingly absurd?

It is appellants' contention that (1) the Maryland Uniform Arbitration Act by employing the words "undue means" and "exceeded their powers," intended to require a reviewing court to vacate an award which is rendered without any rational basis, and (2) the award rendered in this case is of that type. Appellee concedes that, despite the favor and finality with which arbitration is viewed, a line of cases has developed which holds that there is a distant threshold beyond which reason is so affronted that judicial remedy may be applied. From argument of counsel and from a similarity of authority cited in their briefs, we glean that the parties here may have approached some general agreement of the state of the law, though neither acknowledged it. Essentially appellants would permit us to vacate an "arbitrary" award while appellee concedes us such authority only when the award is "completely irrational." Our interpretation of the law accords more with appellee; however, its application to the facts in this case does not bode him well.

We hold that when reviewing the fruits of an arbitrator's

award, a judge may withhold only such as were tainted by improbity *or* based on a completely irrational interpretation of the contract. We recognize the very limited extension of the reviewing court's scope of review to include authority to vacate an award that is "completely irrational." Statutory support for this is found not only in the fact that arbitrators "exceeded their powers" when they reach a completely irrational result, but also in the connotation of the words "undue means" in Sec. 3-224 (b) (1). An award that is "completely irrational" is inferentially opprobrious, *i.e.,* "[e]xpressing or carrying a sense of disgrace or contemptuous scorn",[1] causing it to be suspect in its conception.

The complete irrationality rule has as its genesis the New York Court of Appeals [2] which was said to be "the source of much instruction in this field" by the United States Third Circuit Court of Appeals when it too "held that an award of an arbitrator is not subject to judicial revision unless it is ' completely irrational'." *Swift Industries, Inc. v. Botany Industries, Inc.,* 466 F. 2d 1125, 1131. Although the interpretive dispute between appellants and appellee is superficially semantic, we think the New York rule offered by appellee better reflects how limitedly we see our authority to vacate arbitration awards than does the language offered by appellants. The test urged by appellants is that used in labor arbitrations under the Taft-Hartley Act [3] and is best depicted by a statement in *Mogge v. District 8, International Ass'n. of Machinists,* 454 F. 2d 510, 513:

> "We have held this standard to mean that a

---

**1.** *The American Heritage Dictionary of the English Language.* Opprobrious is thus distinguished from "improbity" which is defined as being a lack of complete and confirmed integrity. Improbity is synonymously defined as "dishonesty" but seems to be shaded less harshly.

**2.** Lentine v. Fundaro, 29 N.Y.2d 382, 328 N.Y.S.2d 418, 278 N.E.2d 633.

**3.** It is coincidence, not reason, that causes us to reject a substantial line of federal authority relating to labor relations disputes in favor of a New York State case as did the Court of Appeals (among others) in Bel Pre Med. v. Frederick Contr., 274 Md. 307, despite the fact that New York does not have the Uniform Arbitration Act. *Id.* at 314, n. 5.

reviewing court should not disturb the award so long as the interpretation was not arbitrary."

An adoption of this standard would permit a review of an *interpretation* of a contract under arbitration. It is our view that such review is beyond our authority.

If, however, the language of the contract under arbitration permits but one meaning, an arbitrator who does not follow such a clear contractual mandate exceeds his authority as surely as if he had gone beyond the scope of his express arbitration authority. An award so based does not derive from an arbitrary interpretation. Such a result is rather "completely irrational" since the words of the contract are so clear that there is nothing to interpret. We must judicially accept an arbitrary interpretation of a contract by an arbitrator. We shall vacate a completely irrational one. Of the four questions we will consider in light of these limits, only one has been found to be completely irrational.

## Facts

Appellee contracted to build a condominium apartment building for appellants. Although the lengthy contract was in considerable detail, for simplicity's sake we will describe it as one in which the basis of payment was to be the cost of the work plus a fee, subject to an "upset price." [4] Appellee agreed to construct the building for a fee of $100,000.00 at a cost not to exceed $3,063,480.00. In addition to the payment of the fee, appellants agreed " . . . to reimburse the [appellee] Contractor for the Cost of the Work. . . ." as later defined. Because of disputes arising over what was to be reimbursed, the parties submitted to arbitration [5] pursuant to the terms of the General Conditions. Four items of the arbitration award were disputed by appellants, whereupon they petitioned the Circuit Court of Baltimore City to vacate the award. Appellee moved for, and was

---

**4.** Under a clause of the contract appellee [contractor] was entitled to 25% of any savings below a guaranteed maximum cost generated by appellee. That guaranteed maximum was the "upset price."

**5.** This followed submission to the architect pursuant to the contract, whose resolution of some issues differed from the subsequent arbitration award.

granted, summary judgment leaving the arbitrators' award intact. Still smarting from these adverse rulings, appellants come to us, seeking relief from the four items in the award which they consider arbitrary, but which in order to vacate, we must find completely irrational:

1. the amounts for wages billed to appellants by appellee in amounts exceeding wages actually paid to workmen on the job;
2. the cost of field overhead added to the "upset price" arising out of work delay, the cause of which was disputed;
3. an additional fee for work performed on an apartment constructed for occupancy by appellant Meyerhoff (who wholly owned the corporate appellant);
4. the rental for equipment used on the job but not billed to appellants by appellee within the time required by the contract.

Procedurally our review is similar to a review under Md. Rule 1086 when we are called upon to review actions tried by a lower court without a jury. In such case we may not substitute our judgment for that of the lower court on the evidence, but may only set aside the court's judgment when it is "clearly erroneous." On the other hand, our review here need not seek a preponderance of the evidence to support the award, nor even substantial evidence. There need be only *some* evidence to meet the test of rationality, *i.e.*, it may be so little as to make the result "arbitrary", so long as it is not completely irrational.

## Labor Costs

In addition to the "fixed fee," appellants contracted to reimburse appellee for "Cost of the Work." That term was defined by the contract in pertinent part as:

### "ARTICLE 9

### COSTS TO BE REIMBURSED

9.1 The term Cost of the Work shall mean costs

necessarily incurred in the proper performance of the Work and paid by the Contractor. Such costs shall be at rates not higher than the standard paid in the locality of the Work except with prior consent of the Owner, and shall include the items set forth below in this Article 9.

9.1.1 Wages paid for labor in the direct employ of the Contractor in the performance of the Work ~~under applicable collective bargaining agreements~~, ~~or~~ under a salary or wage schedule agreed upon by the Owner and Contractor, and including such welfare or other benefits, if any, as may be payable with respect thereto.

· · ·

9.1.3 Cost of contributions, assessments or taxes for such items as unemployment compensation and social security, insofar as such cost is based on wages, salaries, or other remuneration paid to employees of the Contractor and included in the Cost of the Work under Subparagraphs 9.1.1 and 9.1.2."

It is conceded that appellee was awarded more than appellee paid out for labor. Appellee billed appellants for labor reimbursement in an amount equal to the number of hours worked multiplied by the hourly wage appearing in the wage schedule referred to in Sec. 9.1.1 for each type of employee. Appellants contend that the contract provides for reimbursement for hours worked multiplied by the amount per hour actually *paid* to the workmen. The arbitrators awarded appellee the wages reflected in the schedule rather than limiting the award to wages appellee had actually paid. Further, the arbitrators added 15% of the appellee's *billings* to the award for reimbursement of insurances, such as unemployment compensation, social security, etc. under Sec. 9.1.3.[6] The arbitrators agreed with appellee but did not benefit us with their reasoning.

---

6. There was ample testimony that a 15% charge was common usage in the industry in lieu of computing insurance and taxes.

We can see no means of interpreting any of the relevant clauses to provide the slightest rationale for such an award. Because appellee finds the only interpretative reed upon which he hopes to cling, in Sec. 9.1.1 above, we must dissect its wording to determine if it is open to interpretation upon any rational basis. If so, we may not vacate the award even if a rational interpretation is arbitrary.

All pertinent language to be analyzed is found in Section 9 under the subtitle "Costs to be Reimbursed," *i.e.*, repaid, paid back, compensated for money spent, or losses or damages incurred. See definition of "reimburse" in The American Heritage Dictionary of the English Language. That which is to be "reimbursed" is:

> "Wages paid for labor in the direct employ of the Contractor in the performance of the Work [7] under a salary or wage schedule agreed upon by the Owner and Contractor . . . ."

Read in the light most favorable to appellants as limitedly as can rationally be accomplished, it would read:

> "Wages paid . . . under a . . . schedule agreed upon. . . ."

In order to arrive at the result reached by the arbitrators, the verb "paid" must be interpreted as meaning *not* paid, but rather "established," or "agreed to." It is completely irrational to hold that wages *paid* under a schedule means wages set or wages established under a schedule whether paid or not. The only conceivable interpretation which would provide the result reached would not only have to fail to give meaning to participle of the verb "paid" but would have to ignore that the expressed subject of Article 9 was "Costs to be Reimbursed." It would also have to define the term "Wages paid" as not referring to those paid by the contractor, but as referring to those paid by the owner to the contractor in an amount equal to the "Wages . . . under a

---

7. For analytical purposes, we have omitted the clause which was stricken by Kroll but which discernably appeared in the contract (see p. 7, *supra*).

. . . schedule . . . ." This spurious reasoning again must ignore "paid" and give a meaning to "wages" which has no basis in or out of the contract. Furthermore, it would be necessary to explain why the eighteen other items under Article 9 conform to the subtitle's subject matter and to the definition of the "Cost of Work" in Sec. 9.1 which is:

> " . . . costs necessarily *incurred* in the proper performance of the Work and *paid* by the Contractor." [Emphasis added].

We then turn to the record, seeking aught that might provide any possibility of interpreting the contract's disputed section other than as reimbursement of wages paid. Appellee points to testimony indicating that an agent of appellants discussed the wage schedule, told another agent of appellants that the wage rates charged were not actual costs, that the labor charges were reduced between the first requisition and the second; that appellants' attorney asked what was meant by "wage schedule" and received the reply, "That's what we [appellants] have been paying them [appellee] "; and that a field agent of appellants who negotiated the reduced wage schedule stated that if it had been refused, he would have given the work to a subcontractor. We find nothing here that would permit an interpretation of an uninterpretable clause. The existence of a wage schedule was acknowledged by appellants' agents and payments thereunder were concededly made. If we assume that appellants' agent had knowledge that the wage rates charged were not actually those paid by appellee for his labor,[8] such knowledge, even when imputed to

---

8. The testimony of such knowledge was:

> "Q Isn't it a fact that Melvyn Pugatch asked you whether the wage rates you were charging were your actual costs?
>
> A Yes, he asked me, sure.
>
> Q What did you say?
>
> A We told him no.
>
> Q You told him no.
>
> A But we showed him how we determined, and we agreed on the schedule. We showed him why and how, and he says, okay, but we

appellants, can hardly change the clear language of the contract. *Kasten Constr. v. Rod Enterprises,* 268 Md. 318, 328-329.

Appellee next notes that Meyerhoff admitted that the phrase made no sense as written with the "or" stricken through, rather than having it left in to indicate an alternative, *i.e.,* reimbursement of wages paid or payment on the basis of an agreed schedule. However, even Meyerhoff cannot put words where words are not. That Meyerhoff denied ever knowing about a schedule, let alone consenting thereto, creates an evidentiary conflict with his own agent, but does not give an interpretive possibility to a clear contract. Nor is such a possibility created by his inability to explain why "wage schedule" was permitted to remain, if he could not explain its purpose. Of course, if there was no rational purpose for the words, the dilemma we faced with

---

cut it back. That's between the first and the second requisition on the job. We went through it.

Q Later on sometime early in January of '71 when the schedule was increased, it is a fact, isn't it, you told him the costs had increased at that time because of union negotiations or the union shop?

A We told him that we had to give our men a raise and the amount of money he was paying did not cover the raises. We also told him the following. We knew there were going to be further raises, and we said to Melvyn, look, we're going to hold the line. We were anticipating for a year ahead of time. We didn't know — at that time there were tremendous raises in the construction union. He said, okay, we will go ahead and permit you to take the raises but no more.

We were anticipating the costs, which came along in June, came along in July, wages kept going up. We don't have contracts with unions. He said, okay, we will permit this raise but no more. You will have to hold the line . . ."

The record is disjointed and unclear, being more in the nature of incomplete record extracts than the full report of the arbitration testimony. The record was compiled below by appellee to meet the motion to vacate, but presumably a complete and coherent transcript was not submitted upon appeal. Appellee explained in his brief:

"What the Appellants argued was, that the award lacked foundation in the arbitration record. In order to meet this assertion, the Appellee compiled the voluminous exhibit consisting of 765 pages, all but the first 37 pages of which are testimony and exhibits before the arbitrators, to show the evidentiary basis for the findings."

"wages paid" would face us again: Why are the words there if they have no reasonable meaning?

We do not find the reference to a wage schedule left without *any* interpretable purpose as we did with "wages paid." Such schedule, which was substantially in excess of the wages actually paid, may have been established to set the maximum referred to in the item immediately preceding (Sec. 9.1) providing that:

> "Such costs shall be at rates not higher than the standard paid in the locality of the Work except with prior consent of the Owner, . . ."

It would be interpretive logic, explaining the retention of the reference to a wage schedule, to read the two sections together, *i.e.*, that the wages paid for labor would not exceed a wage schedule, the rates of which, if in excess of the standard paid in the locality, were nonetheless consented to by the owner.

Having exhausted every remote possibility of interpreting the contract language to arrive at the result reached, we will remand for the chancellor to vacate so much of the award as was credited to *wages* which had never been *paid* by anyone. It necessarily follows that he should vacate as well the award credited to the peripheral wage costs alluded to in Sec. 9.1.3:

> " . . . insofar as such cost is [not] based on wages, salaries, or other remuneration paid to employees of the Contractor. . . ."

Thus the 15% allowance in lieu of compensation insurance, taxes, etc., should apply only to the amounts reimbursed for wages actually paid.

Finally, it need hardly be explained why we find no merit in appellee's theory that appellants are equitably estopped from asserting the claim for wages because the bills based on the schedule were paid by appellants. If we find a contractual interpretation allowing such payment to be "completely irrational," it would be "shockingly absurd" to then permit the unjustified sum to be retained. The billing

by appellee initiated the wrongful payment. It would seem the doctrine of equitable estoppel would more appropriately apply against appellee than in its favor, since estoppel always involves the implication that the *asserting party* was misled to his prejudice. *Crane Co. v. Onley*, 194 Md. 43; *Benson v. Borden*, 174 Md. 202, 219-220.

## Field Overhead

The arbitrators decided among other things:

"2. Respondent is responsible for raising the up-set price of the contract by SEVENTY-SIX THOUSAND AND 00/100 DOLLARS ($76,000.00), the amount of field overhead claimed and proved."

By not holding appellee responsible for $76,000 of field overhead caused by contractual changes at appellants' behest, the final cost was commensurately reduced. Appellee was entitled to 25% of any savings below a guaranteed maximum, thus enhancing his profit by $19,000 in this instance.

Appellants' arguments have a persuasive ring to them but because of conflicting clauses of the contract, the question must be ultimately viewed as an interpretive one. Appellants recognize this in their "Post-Trial Memorandum." They contend that Sec. 10.1.4 of the contract excludes overhead or general expenses from reimbursable costs except as expressly included in Article 9. They continue:

"Article 9, while allowing reimbursement for a wide variety of actual costs, clearly does not turn around and permit reimbursement for *overhead, except possibly for Section 9.1.18, which allows reasonable costs and expenditures necessary for the operation of the field office.*" [Emphasis partially added].

Although appellants go on to say that costs of operation of the field office are not part of appellee's overhead claim for delay, we find portions of the record pointed out by appellee

testimonially sufficient so that the result reached would not exceed the limits of rationality. The award will stand.

### Additional Fee

Half of the ninth floor of the apartment building was to be appellant Meyerhoff's personal apartment. One hundred thousand dollars worth of "extras"[9] went into that apartment. The arbitrators awarded 20% of the labor and material costs as a fee to appellee indicating that it should be paid by "Respondent [The Slade Corporation] and/or JOSEPH MEYERHOFF."

Appellee contends that the Meyerhoff apartment should be treated as were other apartments which were improved at the behest of the tenant purchasers. Appellants argue to the contrary setting forth three basic reasons:

1. The other prospective owners specifically agreed to the 20% fee. "Nobody agreed to a 20% fee for the Meyerhoff apartment."
2. Work in the other apartments involved relatively minor amounts. Because the improvements were substantial a 20% fee would not be reasonable.
3. Meyerhoff was not a party to the arbitration.

The testimony clearly indicates that Meyerhoff agreed that all changes made by appellee for the apartments generally would be at a cost plus 20% fee to appellee. Not only do we find sufficient evidence to overcome the test of complete irrationality, there was sufficient to justify the result reached even under a more stringent test.[10]

Meyerhoff's contention that he did not have to pay because his apartment was within the scope of the contract is presumably based upon his ownership of the contracting corporation. He then points to contract provisions that

---

9. Changes or additions not contemplated by the original contract and specifications.

10. Nor do we find that it is irrational not to reduce the fee because the improvements for Meyerhoff were more substantial than for the others as suggested by appellee.

"7.2 . . . There shall be no Fee increase or decrease for an increase or decrease in the scope of the Contract."

Whether or not Meyerhoff's improvements were within the scope of the contract was clearly interpretive and in light of the evidence an award either way could not have been vacated as in excess of the arbitrators' powers.

But appellants further claim that since that result necessarily treats Meyerhoff *qua* apartment purchaser as distinguished from Meyerhoff *qua* the contracting owner of the building, the award cannot go against him because he was not a party to the arbitration.

In addition to the tenor of Meyerhoff's testimony accepting, if not recognizing, his participating role in the arbitration, we find in the record the following letter dated July 25, 1973:

"Samuel A. Kroll, Inc.
 10300 South Dolfield Road
 Owings Mills, Maryland    21117

          In re:      O-S Corporation Arbitration

Gentlemen:

I hereby personally guarantee to you that if the arbitrators of the American Arbitration Association decide there is an amount due your Company over and above any amount or amounts found by them to be due by it to O-S Corporation, the resulting net award against O-S Corporation will be paid.

Sincerely,

[s]    Joseph Meyerhoff

Joseph Meyerhoff

     JM:hc"

This is an indication of Meyerhoff's understanding that he personally assumed liability for the results of the arbi-

tration. The question then becomes, was the apartment improvement an issue?

It becomes clear from the testimony that the issue of Apartment 901 was an arbitrable question as one aspect of the dispute. It is not questioned that this issue was submitted first to the architect as a condition precedent to arbitration under the "GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION." Thereafter the scope of arbitration is broad:

> "Any claim, dispute or other matter that has been referred to the Architect . . . shall be subject to arbitration upon the written demand of either party."

In *Bel Pre Med., supra,* 21 Md. App. at 327, Judge Davidson said for this Court:

> "When the parties have agreed to submit any and all controversies arising out of the contract to an arbitrator, all issues other than those expressly and specifically excluded must be submitted to arbitration."

No express and specific exclusion was brought to our attention as to Apartment 901. We, therefore, find the additional costs of improving that Apartment within the scope of arbitration and that the award did not exceed the arbitrators' powers.

### Equipment Rental

Appellants concede that equipment rental for use on the job was a reimbursable expense if statements therefore were submitted timely as required by Article 14:

> "The Contractor shall, at least ten days before each progress payment falls due, deliver to the Architect a statement, sworn to if required, showing in complete detail *all moneys paid out or costs incurred by him on account of the Cost of the Work during the previous month for which he is to be*

*reimbursed* under Article 6 . . . ." [Emphasis added by appellants].

Appellee failed to submit such timely statements which appellants contend deprived them of making their own inspection as to whether the equipment was present and necessary. Appellants' factual arguments as to the substantial savings they might have made by purchasing rather than leasing certain equipment is again persuasive but not so compelling as to render an arbitrator's award to the contrary completely irrational. The award for equipment rental will stand.

> *Judgment affirmed in part and reversed in part.*
>
> *Case remanded: the trial judge is directed to vacate that portion of the award allocated to wages scheduled but not actually paid.*
>
> *Costs to be divided equally between the parties.*