SOUTHERN MARYLAND HOSPITAL CENTER ET AL.
v. EDWARD M. CROUGH, INC.

[No. 820, September Term, 1980.]

*Decided April 10, 1981.*

The cause was argued before MASON, LISS and WILNER, JJ.

*Warren M. Davison,* with whom were *Earle K. Shawe, Patrick M. Pilachowski* and *Shawe & Rosenthal* on the brief, for appellants.

*Gregory J. Miner,* with whom were *Paul M. Rhodes, Craig B. Dunbar* and *Rhodes, Dunbar & Lomax, Chartered* on the brief, for appellee.

LISS, J., delivered the opinion of the Court.

This case arises out of a petition to enforce an arbitration award filed by appellee, Edward M. Crough, Inc., in the Circuit Court for Prince George's County. The award was rendered in a construction contract dispute between appellants, Southern Maryland Hospital Center, et al., and appellees. Appellants filed an answer to appellees' petition, as well as a counterclaim seeking to have the arbitration award vacated or set aside pursuant to the provisions of Maryland Code, Uniform Arbitration Act, Section 3-201, *et seq.*, of the Courts and Judicial Proceedings Article (1974, 1980 Repl. Vol.) Both parties filed cross-motions for summary judgment based upon the record of the proceedings before the American Arbitration Association's panel of three arbitrators and applicable law, and on May 12, 1980 the Circuit Court for Prince George's County (Melbourne, J.) denied appellants' motion for summary judgment, upheld the arbitrators' award, and granted appellees' motion for summary judgment. Appellants thereafter filed this appeal on the grounds that the court below failed to apply properly the standards of Sections 3-224 (b) (1) and (3) of the Courts and Judicial Proceedings Article and controlling precedent. Appellants raise two questions to be determined by this appeal:

1. Did the trial court err in granting summary judgment confirming the arbitration award based upon issues presented and considered by the arbitration panel and the decision of the panel?

2. Did the court below err in granting summary judgment confirming the arbitration award in the light of the established standards of review of arbitration awards in Maryland?

### The Facts

In May 1976, appellee Edward M. Crough, Inc., (hereinafter referred to as "Crough") and Dr. Francis P. Chiaramonte entered into a "Construction Management Agreement" by which Crough agreed (a) to provide design consultation, including efficient scheduling of the work and limiting the costs of the construction of a 300 bed full service

hospital in Prince George's County, Maryland, and (b) to organize and direct the actual construction of the hospital. The agreement was supplemented by two American Institute of Architect (AIA) Forms (A201 and A201/SC) entitled, respectively, "General Conditions of the Contract for Construction" and "Supplementary Conditions of the Contract for Construction." Crough's fee for these services was contractually set at $334,520.

The contract contained a "Guaranteed Maximum Price" of $11.4 million. Crough's owner and chief executive officer, Edward M. Crough, testified that his counsel reviewed the CM Agreement and Crough both had prior experience with such clauses and understood them.

Dr. Chiaramonte is the only general partner in the limited partnership which owns the appellant hospital and will hereafter be referred to as the "owner." The owner testified that by entering into a CM Agreement containing the Guaranteed Maximum Price (hereafter, "GMP"), it was his intent to limit the cost of construction to a sum certain of $11.4 million.

Pursuant to its undertaking to perform this job at or below $11.4 million, Crough segregated the work into approximately 25 "line items" or "bid packages," such as excavation, concrete work, mechanical, electrical, landscaping, etc. Crough estimated the cost of each of these bid packages, which were then let out for competitive bidding. After Crough awarded contracts based upon the bids received, a surplus of over $798,000 was generated from the difference between Crough's bid package estimates and the actual contracts awarded. Stated another way, the projected cost of building the hospital was approximately $10.6 million at that point — well below the $11.4 million GMP, providing a "cushion" or "surplus" for the parties.

Even before the owner signed the CM Agreement, the parties were aware of a problem that the structural engineer was having with regard to some soil borings. As a result of ground conditions, the engineer advised changing the nature of the foundation, which had originally been

designed to use "spread" footings. The CM Agreement was signed by the owner and the parties then discussed possible alternative foundations. Ultimately it was determined that construction could only proceed with a "mat" foundation, i.e., an approximately two foot-thick slab of concrete underlying a layer of sand and the building's floor slab.

As a result, the original plans and specifications had to be changed to reflect the required mat foundation and the subcontractors, such as the excavator, whose contracts had already been awarded, were notified of the changes. Those subcontractors asked for and received additional funds to perform the changed work.

The foundation redesign affected not only the excavating bid package, but also a number of other items, such as concrete, mechanical and electrical work. Crough advised the owner that the increased costs caused by the mat foundation could easily be absorbed by the nearly $800,000 surplus.

Article 12 of the General Conditions Section of the CM Agreement sets forth the exclusive method for changing the GMP under the contract. It provides, in relevant part (at Sections 12.1.2 and 12.2.1), as follows:

> 12.1.2 A Change Order is a written order to the Contractor signed by the Owner and the Architect, issued after the execution of the Contract, authorizing a Change in the Work or an adjustment in the Contract Sum or the Contract Time. Alternatively, the Change Order may be signed by the Architect alone, provided he has written authority from the Owner for such procedure and that a copy of such written authority is furnished to the Contractor upon request. A Change Order may also be signed by the Contractor if he agrees to the adjustment in the Contract Sum or the Contract Time. The Contract Sum and the Contract Time may be changed only by Change Order.
>
> 12.2.1 If the Contractor wishes to make a claim for an increase in the Contract Sum, he shall give the Architect written notice thereof within twenty days

> after the occurrence of the event giving rise to such claim. This notice shall be given by the Contractor before proceeding to execute the Work, except in an emergency endangering life or property in which case the Contractor shall proceed in accordance with Subparagraph 10.3.1. No such claim shall be valid unless so made. If the Owner and the Contractor cannot agree on the amount of the adjustment in the Contract Sum, it shall be determined by the Architect. Any change in the Contract Sum resulting from such claim shall be authorized by Change Order.

It is conceded that Crough neither prepared, nor requested anyone else to prepare, a change order during construction of the project, either for the mat foundation work or for any other work (including "extras," which are the subject matter of this dispute). Nor did the owner's architect prepare or request Crough to prepare a change order even though the architect did order and approve many of the changes proposed during the course of the construction of the project. It is clear from the record extract that the owner knowingly permitted non-compliance with the strict terms of the agreement providing the cost of completion of the project did not exceed the $11.4 million GMP.

The hospital was completed sometime in November of 1977, purportedly well within the confines of the $11.4 million GMP. In August of 1978, Crough submitted to the owner a bill for "extras" and thereby sought to recover costs in excess of the GMP.

The facts set forth above were presented to a Board of Arbitration in six days of hearing, following which voluminous briefs were filed by the parties. On February 8, 1980, the Board of Arbitration issued its award, in favor of Crough in the amount of $357,888.72 plus 8% interest.

Cross-motions for summary judgment were filed in the Circuit Court for Prince George's County. Crough's motion sought enforcement of the award, while the owner's motion sought to have the award set aside. The court denied the

owner's motion and granted Crough's motion, upholding the Board of Arbitration's decision. From this judgment, the owner appeals.

## 1. and 2.

The proceedings below established beyond dispute that both parties agreed to submit the issues raised in the appellee's demand for arbitration to the arbitration panel for resolution. No issue has been raised contesting the jurisdiction or authority of the arbitration panel to decide the issues submitted. Arbitration is a "favored" process in Maryland where disputes are resolved privately by a tribunal rather than publicly by a court.[1] Maryland Courts have consistently held that when the arbitration agreement is "clear and precise" as in this case any controversy arising out of the agreement or breach thereof shall be settled by the arbitration procedure where all issues must be sumitted, unless expressly and specifically excluded.[2]

Appellant at the arbitration hearing presented evidence, examined and cross-examined witnesses and filed a post-hearing brief. Appellant raised the following issues to be decided: (1) whether the owner reasonably believed that the contract's Guaranteed Maximum Price remained intact throughout the construction contract; (2) whether the

[1]. *See* Bel Pre Medical Center, Inc. v. Frederick Contractors, Inc., 21 Md. App. 307, 320 A.2d 558 (1974), rev'd on other grounds, 274 Md. 307, 334 A.2d 526 (1975) where the Court said:

The parties expect that the arbitrator's competence and skill, based on his specialized knowledge and experience, will produce a judgment which is founded not only upon the literal meaning of the words appearing in the contract document itself, but also on their meaning in the context of the practices and customs associated with their use. Schreiber v. Pac. Coast Fire Ins. Co. [195 Md. 639, 75 A.2d 108 (1950).] *Id.* at 315-16.

[2]. *See* Bel Pre Medical Center, Inc. v. Frederick Contractors, Inc., *supra; see also* Nelley v. Mayor & City Council of Baltimore City, 224 Md. 1, 166 A.2d 234 (1960); United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S. Ct. 1347, 4 L. Ed. 2d 1409 (1960). With the passage of the Maryland Uniform Arbitration Act, Code (1957), Art. 7 — 1965 Laws of Maryland, ch. 231 Sec. 2, a policy in favor of arbitration was formally established in Maryland including: suits to enforce arbitration, suits to compel arbitration, and suits to stay court action pending arbitration. *See* Bel Pre Medical Center, Inc. v. Frederick Contractors, Inc., *supra.*

contractor can recover for work done without securing a "change order" as defined in the parties' contract; and (3) whether the owner ever waived or modified the contractual GMP.

Although no memorandum was filed by the arbitrators in explanation of their findings, it is clear that the parties raised the issue before the Board of the appellee's entitlement to payment for the changed or extra work it performed. It is further clear that this issue was within the scope of the arbitration agreement and the arbitrators decided the issue favorably to the appellee in its unanimous award.

The Maryland Code (1976, 1980 Repl. Vol.) Section 3-224 (b) of the Courts and Judicial Proceedings Article sets out the grounds for vacating an arbitration award:

> (b) Grounds. — The court shall vacate an award if:
>
> (1) An award was procured by corruption, fraud, or other undue means; [or]
>
> * * *
>
> (3) The arbitrators exceeded their powers.

The threshold question before the court below was whether the Board of Arbitrators had the authority to grant the relief sought by appellee. In reviewing the determination of an arbitration panel it has been held that a mere error in the laws or failure on the part of the arbitrators to understand or apply the law will not justify judicial intervention, and the courts' function in confirming or vacating a commercial award is "severely limited." *See Ludwig Honold Mfg. Co. v. Fletcher,* 405 F.2d 1123, 1127 (3d Cir. 1969), and the cases cited therein. The same Court, in describing the exercise of judicial restraint over arbitrators' decisions, said: "The interpretation of arbitrators must not be disturbed as long as they are not in 'manifest disregard' of the law. . . ." *Id.* at 1128; *see also Wilko v. Swan,* 346 U.S. 427, 74 S. Ct. 182, 98 L. Ed. 168 (1953). Furthermore, it has recently been held that the misapplication of certain rules of

contract interpretation by arbitrators does not rise to the level of "manifest disregard of law." *Revere Copper and Brass, Inc. v. OPIC,* Washington Daily Law Rptr., No. 79-1159 (D.C. Cir. Feb. 26, 1980).

Appellant contends that the trial judge was clearly erroneous in affirming the arbitration award in that it was based on a completely irrational interpretation of the contract between the parties. The standards for review of an arbitration award in Maryland were explicated by this Court in *O-S Corporation v. Samuel A. Kroll, Inc.,* 29 Md. App. 406, 348 A.2d 870 (1975), where it was held:

> We hold that when reviewing the fruits of an arbitrator's award, a judge may withhold only such as were tainted by improbity *or* based on a completely irrational interpretation of the contract. We recognize the very limited extension of the reviewing court's scope of review to include authority to vacate an award that is "completely irrational." Statutory support for this is found not only in the fact that arbitrators "exceeded their powers" when they reach a completely irrational result, but also in the connotation of the words "undue means" in Sec. 3-224(b)(1). An award that is "completely irrational" is inferentially opprobrious, i.e., "[e]xpressing or carrying a sense of disgrace or contemptuous scorn," causing it to be suspect in its conception. [29 Md. App. at 408-09.]

This Court in *Kroll* severely restricted the courts in reviewing an interpretation of a contract by arbitrators if that interpretation was supported by some rationality. The Court further stated, "We must judicially accept an arbitrary interpretation of a contract by an arbitrator." *Id.,* at 410.[3]

---

3. The "complete irrationality" rule is derived from Swift Industries, Inc. v. Botany Industries, Inc., 466 F.2d 1125 (3d Cir. 1972) which relied on the decision in Lentine v. Fundaro, 29 N.Y.2d 382, 328 N.Y.S.2d 418, 278 N.E.2d 633 (1972). In Lentine, the court said that even if the language in the agreement in question is unambiguous, an interpretation by the

Appellant argues that *Kroll, supra,* is four-square on point factually with the case at bar. We do not agree. *Kroll* involved an interpretation of the reimbursable wages provision of the contracts submitted for arbitration. The award was vacated on appeal as an irrational award on the ground that it allowed recovery for wages not actually paid by the contractor. This circumstance is substantially different from the factual situation in the instant case. The arbitration panel had before it evidence that even before the CM contract was signed substantial changes were required in the foundation of the building and that this required changes in the work to be done by the various subcontractors. In addition, the prices to be paid for the various packages prepared by the construction manager were materially affected by the change. It is significant that none of the parties found it necessary to comply with the elaborate change order procedure detailed in the contract. It is also clear from the record that appellant was aware of all changes in the scope of the contract work other than the foundation and that appellant was advised by appellee of the estimates of the potential increased costs caused by the required changes. There was no suggestion before the arbitration panel that the changes made were not required, that they were not performed in a workmanlike manner, or that the prices charged were not fair and reasonable. Appellant has, in effect, attempted to relitigate the issue of the interpretation of the change order provision of the CM contract which was fully litigated before the arbitration panel and decided adversely against appellant. In resolving this issue it is clear from our reading of the record that the panel made its interpretation on the basis of the testimony of the appellant (which clearly implied a waiver of the requirement of the furnishing of "change orders" under the contract) and the conduct of the parties, *i.e.,* the owner, the owner's architect and the contractor, during the performance of the contract.

---

arbitrators to the contrary is not in excess of their powers as arbitrators are not bound by principles of substantive law (*viz.* the Statute of Frauds) or by rules of evidence (*viz.* the Parole Evidence Rule).

Appellant has cited a series of cases which he contends establish that the failure to obtain written change orders required by a contract prevents a recovery for the costs of the changes made. The cases cited are: *McNulty v. Keyser Office Bldg. Co.,* 112 Md. 638, 76 A. 1113 (1920); *Williar v. Nagle,* 109 Md. 75, 71 A. 427 (1908); *Merritt v. Peninsular Construction Co.,* 91 Md. 453, A. 1013 (1900); *Abbott v. Gatch,* 13 Md. 314, 71 Am. Dec. 635 (1859); *Baltimore Cemetery Co. v. Coburn,* 7 Md. 202 (1854).

Not one of the cases cited involved an arbitration award, nor was there any evidence of either a waiver of the requirement of a written change order or of the owner's promise to pay for changed work.

On the record before us, we conclude that the summary judgment in favor of the appellee was properly granted.

> *Judgment affirmed.*
> *Costs to be paid by appellant.*